ACCEPTED
07-14-00433-CR
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
1/13/2015 2:50:32 PM
Vivian Long, Clerk

# No. 07-14-00433-CR

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS

1/13/2015 2:50:32 PM

VIVIAN LONG
CLERK

In the Court of Appeals for the
Seventh Judicial District
Amarillo, Texas

―――――――――――――――――――――

## EX PARTE THOMAS MICHAEL DIXON, *Appellant*.

―――――――――――――――――――――

On Appeal from the 140th District Court
Lubbock County, Texas
The Honorable Jim Bob Darnell Presiding

―――――――――――――――――――――――――――――――――

## APPELLANT'S BRIEF

―――――――――――――――――――――――――――――――――

Frank Sellers
Daniel W. Hurley
HURLEY, GUINN & SELLERS
1805 13th Street
Lubbock, Texas 79401
P: 806.771.0700
F: 806.763.8199

Selden Hale
ATTORNEY AT LAW
310 Southwest 6th Avenue
Amarillo, Texas 79101
P: 806.372.5711
F: 806.372.1646

ATTORNEYS FOR APPELLANT

**ORAL ARGUMENT NOT REQUESTED**

## LIST OF PARTIES & COUNSEL

**Defendant/Appellant**

Thomas Michael Dixon

**Trial and Appellate Counsel**

Frank Sellers
Daniel W. Hurley
HURLEY, GUINN & SELLERS
1805 13th Street
Lubbock, Texas 79401
P: (806) 771-0700
F: (806) 763-8199
E: frank@hurleyguinn.com

**The State of Texas**

**Appellate Counsel**

Jeff Ford
Lauren Murphree
Wade Jackson
LUBBOCK COUNTY DISTRICT ATTORNEY'S OFFICE
P.O. Box 10536
Lubbock, Texas 79408-3536

**Trial Counsel**

Matt Powell
Sunshine Stanek
Wade Jackson
Lauren Murphree
LUBBOCK COUNTY DISTRICT ATTORNEY'S OFFICE
P.O. Box 10536
Lubbock, Texas 79408-3536

## TABLE OF CONTENTS

LIST OF PARTIES & COUNSEL ........................................................................II

TABLE OF CONTENTS ...................................................................................III

INDEX OF AUTHORITIES ................................................................................ V

STATEMENT OF THE CASE ............................................................................ 1

STATEMENT REGARDING ORAL ARGUMENT ...................................................... 2

ISSUE PRESENTED ..................................................................................... 2

STATEMENT OF FACTS .................................................................................. 2

SUMMARY OF THE ARGUMENT ...................................................................... 7

STANDARD OF REVIEW.................................................................................. 7

ARGUMENT ................................................................................................. 8

1. Because this appeal deals with a denial of a writ of habeas corpus, this Court has jurisdiction. ...................................... 8

2. The law prohibits excessive, oppressive bail. ...................................... 9

3. Nearly all of the relevant factors weigh in Dixon's favor; this Court should reduce bail to $100,000........................................................ 10

    A. Sufficient to Assure Appearance ................................................ 10

    B. Not to be Used as an Instrument of Oppression ......................... 15

    C. Nature of the offense .................................................................. 16

    D. Ability to Make Bail ..................................................................... 19

    E. Future Safety of the Victim and the Community ......................... 21

    F. Remaining Factors...................................................................... 21

    G. Willing to Comply with Conditions .............................................. 23

PRAYER FOR RELIEF ............................................................. 24

CERTIFICATE OF SERVICE....................................................... 26

CERTIFICATE OF COMPLIANCE ................................................ 26

**CASES**

*Badall v. State,* No. 09-04-211 CR 2004 WL 1699911 (Tex. App.—Beaumont July 28, 2004, pet. ref'd) (not designated for publication) .......................... 12

*Ex parte Beard,* 92 S.W.3d 566 (Tex. App.—Austin 2002, pet. ref'd) .... 9, 12, 19

*Ex Parte Brooks*, 376 S.W.3d 222 (Tex. App.—Fort Worth 2012, pet. ref'd) .. 15

*Ex Parte Davis*, 147 S.W.3d 546 (Tex. App.—Waco 2004, no pet.) ................. 12

*Ex Parte Evans*, No. 06-11-00048-CR, 2011 WL 2623589 (Tex. App.—Texarkana July 6, 2011, no pet.) (mem. op., not designated for publication) ....................................................................................... 11, 12

*Ex parte Goosby*, 685 S.W.2d 440, 442 (Tex. App.—Houston [1st Dist.] 1985, no writ), ................................................................................................ 13

*Ex parte Herrera*, No. 05-14-00598-CR, 2014 WL 4207153 (Tex. App.—Dallas Aug. 26, 2014, no pet.) (mem. op., not designated for publication) ........... 8

*Ex parte McDonald*, 852 S.W.2d 730 (Tex. App.—San Antonio 1993, no writ). ................................................................................................................... 12, 19

*Ex parte Milburn*, 8 S.W.3d 422 (Tex. App.—Amarillo 1999, no pet.) .... 10, 13, 14, 21

*Ex Parte Miller,* 631 S.W.2d 825 (Tex. App.—Fort Worth 1982, pet. ref'd)... 19

*Ex parte Rubac,* 611 S.W.2d 848 (Tex. Crim. App. 1981) ............................ 10, 22

*In re Durst*, 148 S.W.3d 496 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ................................................................................................................... 15, 16, 23

*In re Estrada*, 398 S.W.3d 723 (Tex. App.—San Antonio 2008, pet. ref'd)..... 13

*In re Estrada,* 398 S.W.3d 723, (Tex. App.—San Antonio 2008, pet. ref'd)....20

*In re Henson,* 131 S.W.3d 645 (Tex. App—Texarkana 2004, no pet.) .............12

*Ludwig v. State,* 812 S.W.2d 32 (Tex. Crim. App. 1991) ..................................12

*Ludwig v. State,* 812 S.W.2d 323 (Tex. Crim. App. 1991). ...............................21

*Nguyen v. State,* 881 S.W.2d 141 (Tex. App.—Houston [1st Dist.] 1994, no pet.) ...................................................................................................................23

*Ragston v. State,* 424 S.W.3d 49 (Tex. Crim. App. 2014) ...................................8

*Smithwick v. State,* 880 S.W.2d 510 (Tex. App.—San Antonio 1994, no pet.)15

*Vasquez v. State,* 03-13-00717-CR, 2014 WL 3732962 (Tex. App.—Austin July 25, 2014, no pet.) (mem. op., not designated for publication) .....................8

## STATUTES

TEX. CODE CRIM. PROC. ANN. art. 17.15.............................................................10

## RULES

TEX. R. APP. P. 9.5(d)............................................................................................25

## CONSTITUTIONAL PROVISIONS

TEX. CONST. art. I, § 11 .......................................................................................21

TEX. CONST. art. I, § 13 .........................................................................................9

U.S. CONST. amend. VIII........................................................................................9

## STATEMENT OF THE CASE

Appellant Thomas Michael Dixon was arrested on July 16, 2012, and charged with capital murder. (3 RR 4: DX 1).[1] His bail was set at $10,000,000. (*Id.*). A Lubbock County Grand Jury subsequently indicted Dixon for two counts of capital murder.

Dixon's trial began on October 27, 2014. (CR 8). After a three-week jury trial, the jury was unable to reach a verdict. (*Id.*). The trial court declared a mistrial. (*Id.*).

Several weeks after the mistrial, Dixon filed a writ of habeas corpus seeking a bond reduction. (*Id.* at 5). After a hearing on December 17, 2014, the trial court refused to reduce Dixon's bail. (*Id.* at 15). Dixon filed notice of appeal to this Court the same day. (*Id.* at 9).

---

[1] Citations to the record appear as follows:

**Writ Hearing**—Reporter's Record: __ RR __; Defense Exhibit: DX __.

**Clerk's Record:** CR __.

**Original Trial Transcript:** __ TR __, where the first blank represents the day of trial and the second blank the transcript page. All citations to the original trial come from DX 14 offered at the writ hearing. The writ hearing exhibit volume lists this as a State's Exhibit that was mailed to the Court. As the Court can tell from the numbering of the exhibits, this was a defense exhibit. If the Court has not received the DVD, Dixon requests this Court advise the parties in order for the Court to have the benefit of the entire record before deciding this case.

## STATEMENT REGARDING ORAL ARGUMENT

In order to allow the Court to render a quick judgment, Dixon does not request oral argument.

## ISSUE PRESENTED

Courts are to consider twelve factors when determining an appropriate bail amount. Numerous courts have approved $100,000 bail in capital murder cases. Here, only the factors dealing with general nature of the offense and potential punishment support higher bail. But even those factors, when carefully considered, support a monumental bail reduction because six jurors voted to acquit Dixon at his prior trial. Did the trial court err by refusing to reduce Dixon's bail from $10,000,000 to $100,000?

## STATEMENT OF FACTS

Thomas Michael Dixon, an Amarillo surgeon, was arrested on July 16, 2012. (2 RR 33). Dixon was charged with two counts of capital murder. His bail was set at $10,000,000. (2 RR 15; 3 RR 4: DX 1). For eight months, Dixon was in solitary confinement. (13 TR 24). Dixon never sought a bond reduction.

2

Over two years later, the State tried Dixon. The State sought to prove that Dixon hired co-defendant David Shepard to kill Lubbock pathologist Joseph Sonnier, III or, alternatively, that Dixon was a party to a murder in the course of a burglary. After a three-week jury trial, a Lubbock jury was unable to reach a unanimous verdict. (CR 8). Two jurors provided affidavits of their recollection of the final votes prior to the mistrial. (3 RR 15: DX 12; 3 RR 16: DX 13). Both jurors swore that numerous jurors voted to acquit Dixon of every felony charge submitted to the jury. (3 RR 15: DX 12; 3 RR 16: DX 13.). The State offered no evidence to dispute these affidavits.

Following the mistrial, Dixon filed this application for writ of habeas corpus seeking a bond reduction. At the hearing, Dixon offered a number of exhibits and called two witnesses: Ken Herzog and Mary Dixon.

Herzog, manager of Lubbock Bail Bond, the oldest bonding company in the Lubbock area, testified that it would probably be impossible to post a $10,000,000 bond in Lubbock County. (2 RR 9). He doubted that any bonding company would be permitted by its insurance company to write a bond in that amount. (*Id*.). Herzog testified his company would require a

3

cash fee of $1,000,000 up front, as well as "collateral – or some kind of property to back the biggest part of the 10 million." (*Id.* at 10). Herzog had spoken to Dixon's family and informed them that it would not be possible for his bonding company to post the bond at its current amount. (*Id.* at 11). The State did not question.

Mrs. Dixon, Dr. Dixon's mother, testified about Dr. Dixon's upbringing and her attempts to secure her son's release on bond. Mrs. Dixon was born and raised in Spearman, and her family has been there since the 1800s. (*Id.* at 18). Likewise, Dr. Dixon was raised in Spearman and still has family and friends there. (*Id.* at 19). Dr. Dixon has three children, ages 15, 19, and 26, all of whom live in Amarillo. (*Id.* at 19–20). From 2003 until the time of his arrest, Dr. Dixon practiced medicine, specifically plastic surgery, in Amarillo. (*Id.* at 20). In addition, Dr. Dixon still owns Sensei Med Spa, an Amarillo business that has struggled to break even since his arrest. (*Id.* at 28).[2] Mrs. Dixon also testified about the twelve Lubbock bonding companies she contacted in order to secure her son's

---

[2] Sensei does not own any real property. (2 RR 34).

release. (*Id.* at 23). Only one bonding company was willing to make the current bond, and that company would require a $1,000,000 cash down payment, as well as collateral worth $3,000,000 from Dr. Dixon. (*Id.*). Mrs. Dixon testified that because her family had already spent upwards of $1,250,000 on the first trial, the family could not afford to make either the down payment or provide the collateral. (*Id.* at 23–24).[3]

Mrs. Dixon also provided insight into her son's current financial condition. Since his arrest over two years ago, Dr. Dixon has had no income. (*Id.* at 21). Yet, with the help of his family, he has continued to meet his child support obligations of $1,800 per month, (*Id.* at 25), as well as pay contractual alimony of $3,000 per month. (*Id.*). Dr. Dixon's only seemingly significant asset is his home in Amarillo, but the home's value is roughly equal to its mortgage debt — perhaps less. (*Id.* at 26–27). He also has an interest in an oil and gas lease that pays less than $150 per month (*Id.* at 30), as well as a 1994 Jeep valued at $1,500– $2,000. (*Id.* at 34). Finally,

---

[3] This is especially true in light of the fact that the State has indicated it may seek the death penalty at the retrial, which would exponentially increase the Dixons' financial obligations. (2 RR 25).

Dr. Dixon had, in his residence at the time of his arrest, $1,800 in currency and a collection of coins with an unknown value. (*Id.* at 30).

In light of the astronomical expense the Dixon family has already incurred and will continue to incur going forward, Mrs. Dixon requested that the Court set her son's bond at $100,000. (*Id.* at 26).

Mrs. Dixon also told the Court that her son was willing to wear a GPS-tracking ankle monitor. (*Id.* at 28). Dr. Dixon also surrendered his passport to the court. (*Id.* at 17).

Dr. Dixon offered a number of exhibits in addition to the juror affidavits mentioned above. He offered ten Lubbock County capital murder indictments showing the bond amounts for each case. The admitted exhibits showed that the highest bonds in those cases were $1,000,000.[4] (3 RR 6: DX 3; 3 RR 14: DX 11). Dr. Dixon also offered a DVD containing all of the witness testimony from his prior trial. (3 RR 17: DX 14).

---

[4] Despite the fact that the Rules of Evidence do not apply in habeas corpus bond reduction hearings, TEX. R. EVID. 101(d)(1)(E), the trial court refused to admit the indictments from other Lubbock County district courts.

The State did not call any witnesses or offer any exhibits.

The trial court denied Dixon's request. (CR 15).

## SUMMARY OF THE ARGUMENT

The trial court erred in refusing to reduce Dixon's bail. The Court of Criminal Appeals, this Court, and other Courts of Appeals have held $100,000 as reasonable bail in a capital murder case. The State has already tried and failed to prove Dixon guilty of capital murder. Dixon has strong ties to the community, including three children, a business, and a medical practice in Amarillo, Texas. Dixon's behavior evidences his desire to clear his name. Because the State presented no evidence to contest any of these or the other factors courts must consider when setting bail, this Court must reduce bail.

## STANDARD OF REVIEW

This Court reviews a trial court's bail-amount decision for abuse of discretion. *Ex parte Milburn*, 8 S.W.3d 422, 424 (Tex. App.—Amarillo 1999, no pet.).

1. **Because this appeal deals with a denial of a writ of habeas corpus, this Court has jurisdiction.**

While the Court of Criminal Appeals does not allow appeals from pretrial orders denying motions for bond reductions, *Ragston v. State*, 424 S.W.3d 49, 50 (Tex. Crim. App. 2014), this prohibition does not apply to writs of habeas corpus seeking the same relief. *Ex parte Herrera*, No. 05-14-00598-CR, 2014 WL 4207153, at *3 (Tex. App.—Dallas Aug. 26, 2014, no pet.) (mem. op., not designated for publication) ("The clerk's record shows appellant is appealing from the denial of his writ application. Both appellant and the State agree the Court has jurisdiction to consider this appeal . . . . Because jurisdiction is evident, we need not further address appellant's first issue."); *Vasquez v. State*, 03-13-00717-CR, 2014 WL 3732962, at *1 (Tex. App.—Austin July 25, 2014, no pet.) (mem. op., not designated for publication) ("When interpreting the holding in *Ragston*, various courts of appeals have concluded that although appellate courts do not have jurisdiction over interlocutory appeals of motions for bond reductions, they do have jurisdiction over denials of applications for writs of habeas corpus asserting that the amount of bail set was excessive."). Therefore, this Court

has jurisdiction to decide whether the trial court abused its discretion in denying Dixon's writ application.

## 2. The law prohibits excessive, oppressive bail.

Both our federal and state constitutions forbid excessive bail. U.S. CONST. amend. VIII ("Excessive bail shall not be required . . . ."); TEX. CONST. art. I, § 13 (same). In setting bail, the trial court must balance the accused's presumption of innocence and the State's interest in assuring the accused's appearance at trial. *Ex parte Beard,* 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd). Bail is excessive if it is "set in an amount greater than is reasonably necessary to satisfy the government's legitimate interests." *Id.*

In addition to the constitutional prohibition against excessive bail, the Texas Legislature has given the following statutory guidelines:

1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.

2. The power to require bail is not to be so used as to make it an instrument of oppression.

3. The nature of the offense and the circumstances under which it was committed are to be considered.

9

4. The ability to make bail is to be regarded, and proof may be taken upon this point.

5. The future safety of a victim of the alleged offense and the community shall be considered.

TEX. CODE CRIM. PROC. ANN. art. 17.15. Texas law further permits consideration of the following factors: the possible length of sentence for the indicted offense; the nature and any aggravating factors of the offense; the accused's employment record; the accused's family and community ties; the accused's length of residency in the jurisdiction; the accused's conformity with previous bond conditions; and the accused's prior criminal record. *Ex parte Milburn*, 8 S.W.3d 422, 425 (Tex. App.—Amarillo 1999, no pet.) (citing *Ex parte Rubac*, 611 S.W.2d 848, 849–850 (Tex. Crim. App. 1981)) (citation omitted).

3. **Nearly all of the relevant factors weigh in Dixon's favor; this Court should reduce bail to $100,000.**

A. **Sufficient to Assure Appearance**

This is not the typical capital murder bond reduction appeal. The State has had a chance to prove Dixon guilty beyond a reasonable doubt. Instead, up to six jurors believed he was not guilty.

Dixon has been able to find only one case dealing with a bond reduction following a mistrial based on jury deadlock. *Ex parte Evans*, No. 06-11-00048-CR, 2011 WL 2623589, at *3 (Tex. App.—Texarkana July 6, 2011, no pet.) (mem. op., not designated for publication). *Evans*, an unpublished opinion carrying no precedential value, is distinguishable in at least three ways. First, the defendant was charged with murder after a drive-by shooting. The Court found this significant — likely because drive-by shootings by themselves are a danger to the community. Here, Dixon was not present during the killing of a lone victim. More importantly, the actual killer and State's star witness — who is serving a life sentence without parole — testified that Dixon did not pay for or plan the murder:

> [DEFENSE COUNSEL]: Now, almost immediately you told me that Mike Dixon did not pay you to kill Dr. Sonnier; isn't that true?
>
> [DAVID SHEPARD]: That's correct, sir.
>
> Q. And you also told me that he was not involved in any way in any planning of the killing of Dr. Sonnier; isn't that true?
>
> A. Killing or hurting anybody, yes, sir.
>
> Q. In fact, he did not even want him to be harmed in any way; isn't that true?
>
> A. That's correct, sir.

11

(*E.g.*, 10 TR 8). Second, Evans had recent, prior criminal history. Dixon has none. Finally, the bail in *Evans* was set at $370,000 — over twenty times less than the bail here. *Evans*, No. 06-11-00048-CR, 2011 WL 2623589, at *1. Because there are no cases like this, the Court must look to what has been held reasonable in other capital murder cases.

Other courts have held bail of less than $100,000 in capital murder cases to be reasonable. *See Ludwig v. State*, 812 S.W.2d 323, 325 (Tex. Crim. App. 1991) (two counts murder, capital murder for murdering both victims during same criminal transaction, bail reduced from $2,000,000 to $1,000,000 by Court of Appeals and then to $50,000 by Court of Criminal Appeals); *Ex parte McDonald*, 852 S.W.2d 730, 736 (Tex. App.—San Antonio 1993, no pet.) (bail reduced from $1,000,000 to $75,000).[5] Similarly, this

---

[5] *See also Ex Parte Davis*, 147 S.W.3d 546, 553 (Tex. App.—Waco 2004, no pet.) (capital murder for hiring and aiding assailants after the drug-related murder, bail reduced for both defendants from $1,000,000 to $500,000 and $750,000, respectively); *Ex Parte Beard*, 92 S.W.3d 566, 574 (Tex. App.—Austin 2002, pet. ref'd) (capital murder, injury to elderly person, bail reduced from $8,000,000 to $500,000); *Badall v. State,* No. 09-04-211 CR 2004 WL 1699911, at *4 (Tex. App.—Beaumont July 28, 2004, pet. ref'd) (not designated for publication) (bail reduced from $1,000,000 to $400,000); *In re Henson,* 131 S.W.3d 645, 651 (Tex. App—Texarkana 2004, no pet.) (three counts of capital murder, bail reduced from $750,000 to $500,000 for each count); *In re Estrada*, 398 S.W.3d 723, 727–728 (Tex. App.—

12

Court determined in *Ex Parte Milburn*, that a $2,000,000 surety bond or $500,000 cash bond was unreasonable and reduced bail to $100,000. 8 S.W.3d 422, 427 (Tex. App.—Amarillo 1999, no pet.).[6] At least one court has observed, "There has been a substantial decrease in the value of the dollar over these periods of time[,]" *Ex parte Goosby*, 685 S.W.2d 440, 442 (Tex. App.—Houston [1st Dist.] 1985, no writ), but actual adjustments for inflation would look like this:

| Case | Reduced Bond Amount | Amount in 2014 Dollars[7] |
|------|---------------------|---------------------------|
| *Ludwig* | $50,000 (1991) | $86,692.73 |
| *McDonald* | $75,000 (1993) | $122,569.72 |
| *Milburn* | $100,000 (1999) | $141,747.30 |

San Antonio 2008, pet. ref'd) (felony theft of a vehicle, capital murder, and burglary of a habitation, bail reduced from $1,000,000 to $600,000).

[6] In *Milburn*, the victim's father was charged with capital murder for intentionally or knowingly causing the death of his two-year-old son by blunt force trauma to the stomach. *Id.* at 423. Despite the egregious nature of the offense, this Court reduced the bail because the accused did not have any assets or money for bail, had no prior felony offenses, but did have strong community and family ties. *Id.* at 426–427. This Court also considered the accused's denial of any implication in his child's death. *Id.* at 427. The Court finally found that the accused did not pose a danger to the community or a flight risk for purposes of the trial. *Id.*

[7] Adjustments were calculated using the U.S. Bureau of Labor and Statistics' CPI Inflation Calculator. http://data.bls.gov/cgi-bin/cpicalc.pl (last visited Jan. 13, 2015).

Here, Dixon lacks the resources to post bail at the current, extraordinary amount. (2 RR 21, 26–27). Dixon has had no income for the past two years. (*Id.* at 21). He has had to pay monthly expenses, depleting the only money he had prior to his arrest. Dixon has strong ties to the community as a businessman and father to children that also currently live in the Amarillo community. Dixon does not pose any danger to the community. At the time of his arrest, he had two established businesses, a home, paid his child support and alimony, and was a productive member of society. Like in *Milburn*, Dixon denies any involvement with the offense, and his denial is corroborated by Shepard's testimony that Dixon did not pay, plan, or participate in Sonnier's murder. *Milburn*, 8 S.W.3d at 426. Dixon does not have any criminal history. There is simply no evidence to even suggest that Dixon will not comply with his court-ordered obligations.

Rather, the record strongly supports the opposite conclusion—Dixon intends to clear his name. Even after police questioned him, Dixon left town for an overnight trip but returned quickly to Amarillo until the time

14

of his arrest. (13 TR 183–184). *Smithwick v. State*, 880 S.W.2d 510, 511 (Tex. App.—San Antonio 1994, no pet.) (commenting on defendant's voluntary return to Texas during investigation). And at trial, Dixon insisted upon testifying. Cross examination alone lasted two days. Put simply, the evidence supports the conclusion that Dixon wants to return for trial once again to face these accusations head on.

Moreover, "[t]he State presented no evidence that [Dixon] is a flight risk or that he has outstanding bonds or warrants[.]" *Ex Parte Brooks*, 376 S.W.3d 222, 224 (Tex. App.—Fort Worth 2012, pet. ref'd).

This factor weighs in favor of a $100,000 bail, an amount more than sufficient to assure Dixon's appearance at his retrial.

### B. Not to be Used as an Instrument of Oppression

Bail is oppressive when the amount is so excessive that neither the accused nor the bail bonding companies can afford it. *In re Durst*, 148 S.W.3d 496, 499 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (reducing $3 billion bond to $150,000). Here, only one bonding company said it would be able to make this bond. The trial court, however, expressed concern over whether that one company would be a member of the bail

bond board much longer, making it ineligible to make any bonds. (2 RR 23). Even with the lone willing company, Dixon would be required to pay $1 million cash, as well as provide an additional $3 million in collateral. As discussed below, he does not have that ability. Neither does his family, especially in light of the amount they have already paid and will have to pay in the future for Dixon's retrial. Because the $10 million bail seems "designed solely to prevent [Dixon] from getting out of jail," it is "being used as an instrument of oppression." *Durst*, 148 S.W.3d at 499.

### C. Nature of the offense

The State's theory at trial rested entirely upon a statement made by co-defendant David Shepard two years prior to Dixon's trial. That statement was Shepard's lifeline. By giving the statement, the State allowed Shepard to plead no contest to killing Dr. Sonnier, thereby avoiding the death penalty in favor of a life sentence without parole. Shepard complied, entered a plea, and avoided the death penalty. (8 TR 147-48).

At Dixon's trial, however, Shepard admitted that he lied in the statement to obtain the favorable plea bargain. (*Id.* at 145–147). Repeatedly, Shepard testified that what he said in his October 2012 statement was not

16

true. (*Id.* at 226–227) (testifying that his previous statement that Dixon required him to go by Dr. Sonnier's house to get Dr. Sonnier's patterns was "a complete embellishment, a lie."); (9 TR 14) (testifying that his previous statements about how he acquired the murder weapon and that the weapon was given to him to murder Dr. Sonnier was "a lie."); (10 TR 70) (testifying Dixon "never planned anything my decision to go back there[,]" and that his statement about Dixon's planning and participation in the murder was a "complete embellishment."). Instead, Shepard testified that Dixon did not pay, plan, or request that Dr. Sonnier be harmed. (*Id.* at 8) (testifying that Dixon was not involved in "[k]illing or hurting anybody[,]" and that Dixon did not want Dr. Sonnier harmed in any way); (*Id.* at 73) (testifying that Dixon never planned to harm anyone and that he never paid Shepard to harm anyone); (*Id.* at 74) (testifying that "there was never a plan. If there was a plan, all it was was to – for me to get organized in how I could try to locate them so we could play the trick on them to cause them distress in their relationship. . . . But as far as a plan to hurt somebody,

17

there never was a plan."); (*Id.* at 163) (testifying that Dixon never asked Shepard to harm Dr. Sonnier in any way).

Up to half of the jury believed Shepard's recantation. Looking to Juror Knight's affidavit, he avers that six jurors voted not guilty on every charge except criminal trespass. (3 RR 15: DX 12). And looking to Juror Fuhrmann's affidavit, four jurors voted to acquit Dixon of every charge. (3 RR 16: DX 13). Whatever the truth, this is a far cry from an 11-1 hung jury. It is likely that if the case were retried, it would again result in jury deadlock.

Admittedly, a capital murder charge is the most serious in our Penal Code. Even though the punishment could be death, this case also allowed for the possibility of probation on both counts. Indeed, the jury charge included instructions for charges as low as manslaughter in count 1, and criminal trespass in count 2. (*See* 3 RR 15: DX 12). Thus, although Dixon is charged with an offense that is "among the gravest crimes defined in our criminal law and that it carries a correspondingly severe penalty," the Court must remain "mindful of the rights guaranteed appellant under the

Texas Constitution, our responsibilities under the Texas Constitution, and our obligation to uphold the Texas Constitution and adhere to its principles." *Ex parte McDonald*, 852 S.W.2d 730, 735-36 (Tex. App.—San Antonio 1993, no pet.).

Because the State has tried and failed to prove Dixon guilty of capital murder, and up to half of the jury did not believe the evidence was strong enough to convict him of anything but criminal trespass, the nature and circumstances of the offense weigh in favor of a significantly reduced bond.

### D.    Ability to Make Bail

"Just as a defendant's inability to afford bail does not, in itself, demonstrate that bail is excessive, a defendant's ability to afford bail in the amount set does not in itself justify bail in that amount." *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd).

The accused must "show that he had made an effort to furnish bail in the amount set." *Ex parte Miller*, 631 S.W.2d 825, 827 (Tex. App.—Fort Worth 1982, pet. ref'd).

Dixon's mother testified that she called twelve Lubbock bonding companies in an attempt to secure her son's release, and only one bonding

19

company was willing to make the current bond. (2 RR 23). However, Mrs. Dixon's testimony indicated that neither Dr. Dixon nor his family can afford the requisite $1,000,000 cash down payment and $3,000,000 collateral; this is particularly true because the family spent approximately $1,250,000 for Dr. Dixon's first trial and faces additional expenses to finance a retrial. (2 RR 23–24).

Mrs. Dixon's testimony reflects that the Dixon family is willing to assist in posting bail (in addition to legal fees and associated expenses for his retrial), but also reveals the family's lack of resources to post the current bail. The Dixon family's attempts to post Dr. Dixon's bail after paying for the trial and for his child support, alimony, and business-related bills, are important. But, more importantly, an accused's family bears no legal obligation to help him post bail. *See In re Estrada*, 398 S.W.3d 723, 727–28 (Tex. App.—San Antonio 2008, pet. ref'd).

In addition, Dr. Dixon has been in custody for two years. His funds have been depleted and his only asset, his house, has no equity. Effectively, the current bail amount constitutes no bail because it forces Dixon to

remain in jail pending retrial. *See Ex Parte Milburn*, 8 S.W.3d 422, 424 (Tex. App.—Amarillo 1999, no pet.); *see also* TEX. CONST. art. I, § 11 ("All prisoners shall be bailable by sufficient sureties . . . ."). This factor weighs heavily in favor of a $100,000 bail.

### E.     Future Safety of the Victim and the Community

"The State presented no evidence concerning safety of the community if [Dixon] is released on bail." *Ex parte Milburn*, 8 S.W.3d 422, 426 (Tex. App.—Amarillo 1999, no pet.). This factor weighs in Dixon's favor.

### F.     Remaining Factors

In *Ludwig v. State*, an en banc Court of Criminal Appeals specifically highlighted a few factors also found here to support its decision to reduce a capital murder bail from $1,000,000 to $50,000: significant community ties, license to practice medicine, no prior criminal record. 812 S.W.2d 323, 324 (Tex. Crim. App. 1991). The *Ludwig* court warned: "[T]his Court has yet to condone a bail amount even approaching seven figures, even in a capital case. *Id.* at 325.

Dixon has deep roots in west Texas. He was born and raised in Spearman, and most of his family still lives there. Dixon still owns a home in Amarillo. He has three children that live there. He still owns a business in Amarillo. Prior to his arrest, Dixon made Amarillo his home since 2003. (13 TR 35). Other than time spent obtaining a master's degree in Clemson, South Carolina in the 1980's, (*Id.* at 31), and a two-year surgical specialty at the University of Oklahoma in the early 2000's, (*Id.* at 35), Dixon has lived in Texas his entire life.

Dixon's education and employment history support a lower bond. *Ex parte Rubac*, 611 S.W.2d 848, 850 (Tex. Crim. App. 1981) (citing "petitioner's education and ability to pursue gainful employment" as support for lowering an appeal bond). Dixon has a chemistry degree from West Texas State (13 TR 28), a master's degree in microbiology from Clemson (*Id.* at 30), an MBA from SMU (*Id.* at 32), a medical degree from Texas Tech University Health Science Center (*Id.* at 34), and a surgical specialty from the University of Oklahoma (*Id.* at 34-35). Prior to his arrest, he was a licensed surgeon with a practice in Amarillo. (*Id.* at 35).

Dixon has no history of complying with previous bond conditions because he has no prior criminal record.

Because nearly all of the non-statutory factors weigh in Dixon's favor, this Court must reduce his bail.

### G. Willing to Comply with Conditions

Willingness to comply with conditions favors a reduction from an already reasonable bail. *In re Durst*, 148 S.W.3d 496, 501 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citing *Nguyen v. State*, 881 S.W.2d 141, 144 (Tex. App.—Houston [1st Dist.] 1994, no pet.)). For example, in *Durst*, the trial court ordered, *inter alia*, that Durst surrender his passport and wear an electronic GPS monitor if he were able to post the $3 Billion bail set. *Durst*, 148 S.W.3d at 501. The appellate court, however, first found that a reduction to "well over . . . $300,000" would be reasonable but then addressed the effect of the trial court's conditions on the bail amount. *Id.* The Court concluded that the conditions imposed brought the otherwise unusual case into the proper range and ultimately set bail at $150,000 for each offense. *Id.*

This Court should do the same. Dixon has agreed to self-imposed conditions. He surrendered his passport to the Court without being asked (2 RR 17) and is willing to wear a GPS monitor (*Id.* at 28). Dixon's willingness to comply with these conditions supports an even lower bail.

## PRAYER FOR RELIEF

The State of Texas has tried and failed to prove Dixon guilty of capital murder. In the process, Dixon's financial resources have been exhausted, as have over $1 million of his family's resources. No Lubbock County capital murder defendant has ever been forced to post a bail as high as this, even before their first trial. Dixon should not be forced to either.

WHEREFORE, Dixon prays this Court reverse the trial court's decision and fix bail at $100,000, or whatever other amount the Court deems appropriate.

Respectfully submitted,

_____
Frank Sellers
    Texas Bar No. 24080305
    *frank@hurleyguinn.com*
Daniel W. Hurley
    Texas Bar No. 10310200
    *dwh@hurleyguinn.com*

HURLEY, GUINN & SELLERS
1805 13th Street
Lubbock, Texas 79401
P:  806.771.0700
F:  806.763.8199

Selden B. Hale, III
Texas Bar No. 08734000
*Sbhale310@aol.com*
ATTORNEY AT LAW
310 Southwest 6th Avenue
Amarillo, Texas 79101
P: 806.372.5711
F: 806.372.1646

*Attorneys for Thomas Michael Dixon*

25

## CERTIFICATE OF SERVICE

Pursuant to TEX. R. APP. P. 9.5(d), this brief was served on opposing counsel *via* email to *jford@lubbockcda.com* & *lmurphree@lubbockcda.com* on January 13, 2015.

_____
Frank Sellers

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this brief contains 4,844 words (excluding the caption, identification of the parties, index, list of authorities, signature, certification, and certificate of compliance). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

_____
Frank Sellers