**Ex parte Trey Logan DAVIS.**

**Ex parte Chad Fenley Davis.**

**Nos. 10–04–00083–CR, 10–04–00084–CR.**

Court of Appeals of Texas, Waco.

Aug. 25, 2004.

William F. Carter, Bryan, for appellant.

Bill R. Turner, Brazos County Dist. Atty., Bryan, for appellee.

Before Chief Justice GRAY, Justice VANCE, Justice REYNA.

## OPINION

FELIPE REYNA, Justice.

The State charged Trey and Chad Davis with murder. A magistrate set bail for each at $1,000,000. Trey and Chad filed habeas applications seeking a reduction of bail, which the trial court denied. They contend on appeal that the court abused its discretion because: (1) they cannot afford to make bail in this amount; (2) they have ties to the community which indicate that they do not pose a flight risk; (3) adequate conditions of bail could be imposed to ensure that they pose no threat to the community; and (4) the circumstances of the offense simply do not justify bail in this amount.

Because most of the evidence supports a reduction of bail as to Trey, we will reverse the judgment as to Trey and reduce his bail to $500,000. Because the evidence is less favorable as to Chad but his bail is excessive when compared to other cases involving similar factual scenarios, we will reverse the judgment as to Chad and reduce his bail to $750,000.

## STANDARD OF REVIEW

We review a court's pretrial bail determination under an abuse-of-discretion standard. *Ex parte Rubac*, 611 S.W.2d 848, 850 (Tex.Crim.App. [Panel Op.] 1981); *Ex parte Beard*, 92 S.W.3d 566, 568 (Tex. App.-Austin 2002, pet. ref'd); *Ex parte McCullough*, 993 S.W.2d 836, 837 (Tex. App.-Waco 1999, no pet.). A habeas applicant bears the burden of proving that his bail is excessive. *Rubac*, 611 S.W.2d at 849; *Beard*, 92 S.W.3d at 568; *McCullough*, 993 S.W.2d at 837.

Article 17.15 provides five factors to be considered in determining what bail is appropriate:

1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.

2. The power to require bail is not to be so used as to make it an instrument of oppression.

3. The nature of the offense and the circumstances under which it was committed are to be considered.

4. The ability to make bail is to be regarded, and proof may be taken upon this point.

5. The future safety of a victim of the alleged offense and the community shall be considered.

TEX.CODE CRIM. PROC. ANN. art. 17.15 (Vernon Supp.2004).

Other pertinent factors include family and community ties, work history, length of residence in the county, prior criminal record, conformity with conditions of prior bonds, and any aggravating circumstances of the offense. *Rubac*, 611 S.W.2d at 849–50; *Beard*, 92 S.W.3d at 568; *McCullough*, 993 S.W.2d at 837. Although a defendant's ability to make bail is

a factor for consideration, inability to make bail, even to the point of indigence, does not control over the other factors. *Ex parte Charlesworth*, 600 S.W.2d 316, 317 (Tex.Crim.App. [Panel Op.] 1980); *McCullough*, 993 S.W.2d at 837.

We will review the court's decision in light of the pertinent factors.

## SUFFICIENTLY HIGH TO GIVE REASONABLE ASSURANCE OF APPEARANCE

"[B]ail should be set high enough to give reasonable assurance that the defendant will appear at trial." *McCullough*, 993 S.W.2d at 837 (quoting *Ex parte Brown*, 959 S.W.2d 369, 371 (Tex.App.-Fort Worth 1998, no pet.)). A defendant's ties to the community and work history bear on the adequacy of bail to give reasonable assurance he will appear. *See McCullough*, 993 S.W.2d at 837–38. A defendant's compliance with the conditions of any prior bonds likewise bears on this issue.

Here, Trey testified in his own behalf that he lives with his father Willie in Brazos County. He has lived there for ten years. He works with Willie in the oilfield business, although at the time of the hearing he was unable to work because of a broken arm. Trey had complied with the conditions of a prior appearance bond related to a charge of unlawfully carrying a weapon.

Conversely, Trey's brother Chad did not testify. Nor did he present evidence of his ties to the community or employment situation. Nevertheless, the State presented evidence that Chad has a residence in Point Blank, San Jacinto County, near Lake Livingston.[1] According to the affida-

---

1. The State seems to suggest in its brief that Chad lived in some other residence near Lake Livingston. However, the testimony on which the State relies clearly indicates that the residence in Point Blank is Chad's residence and the record contains evidence of no

vit presented to obtain a search warrant for Chad's residence, this property was "in charge of and controlled by" Trey, Chad, Willie, and others unknown.

The State also presented evidence that Trey and Willie have an occupation other than (or in addition to) the oilfield business and that Chad is engaged in this other pursuit as well. A Texas Ranger testified that he received information from a confidential informant that Trey, Chad, and Willie are personally engaged in trafficking marihuana and cocaine from Mexico to Georgia and elsewhere. This information is corroborated by evidence seized during the search of Chad's home, Willie's and Trey's home, and a tour bus owned by Willie. In these searches, authorities recovered miscellaneous firearms and ammunition, marihuana, drug paraphernalia, more than $26,000 in cash, numerous cell phones and pagers, cell phone parts, numerous vehicles, and out-of-state license plates.

The information provided by the informant is also corroborated by the circumstances of the offense. According to the allegations, the murder victim Tommy Andrade had "ripped off the [Davises] for $100,000 worth of drugs and/or money."

Trey's ten-year residence in Brazos County, his work in the oilfield business, and his compliance with the conditions of his prior bond all lead to the conclusion that a significantly high bail would not be necessary to ensure his appearance at trial. Conversely, his alleged involvement in narcotics trafficking across state and national boundaries and perhaps his access to a residence in another county lead to the opposite conclusion.

Chad on the other hand presented no evidence with regard to this factor which would suggest that a lesser bond would

other real property owned by either Trey, Chad, or Willie.

suffice. The evidence on this factor as to Chad all points to the need for a fairly high bail to ensure his appearance.

## NOT SO HIGH AS TO CONSTITUTE AN INSTRUMENT OF OPPRESSION

■ Bail set in a particular amount becomes "oppressive" when it is "based on the 'assumption that [the accused cannot] afford bail in that amount and for the express purpose of forcing [the accused] to remain incarcerated pending [trial].'" *McCullough*, 993 S.W.2d at 837 (quoting *Ex parte Harris*, 733 S.W.2d 712, 714 (Tex. App.-Austin 1987, no pet.)). The record contains nothing to indicate that the trial court rendered its decision on this basis. *Cf. Harris*, 733 S.W.2d at 714 (trial judge stated, "I'd rather see him in jail than to see someone's life taken. . . .").

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

Trey and Chad are both charged with murder, which carries a potential maximum sentence of life imprisonment and a fine of up to $10,000. *See* TEX. PEN.CODE ANN. §§ 12.32, 19.02(c) (Vernon 2003).

As previously indicated, the allegations are that this was a drug-related killing. The State presented evidence that Chad hired three men from Georgia "to beat Andrade up and let him know that it came from Chad Davis because Andrade had ripped off the [Davises] for $100,000 worth of drugs and/or money." The hired assailants lived in Willie's tour bus which was parked in his driveway during their stay. Trey and Chad provided them marihuana during their stay, gave them firearms for their confrontation with Andrade, and showed them where Andrade lived. The

Davises also provided them an "older model" four-door car for transportation.

The assailants got into a gun battle with Andrade when they confronted him. Two of the assailants received gunshot wounds before they fatally shot Andrade. They called Chad for assistance on a cell phone provided by the Davises. Trey and Chad came to help soon thereafter in Trey's sport-utility vehicle. Trey drove the assailants' car away. Chad drove them to a motel "where they tried to clean up and calm down." Trey later joined them. Chad and he tried to bandage their wounds and gave them pain medication. Willie later transported them back to Georgia in the tour bus and provided them motel rooms in Atlanta where they were treated by a nurse.

This evidence could lead to a conclusion that Chad was the primary instigator of the whole transaction. According to the search warrant affidavit from which most of this information is derived, Chad hired the assailants and met them at the Houston airport. Chad wanted them to let Andrade know that the beating they were to inflict "came from Chad Davis." And although the Chad hired the assailants only "to beat Andrade up," the fact that Trey and Chad furnished them with firearms could lead to the conclusion that Trey and Chad knew the encounter could turn more violent or even that they intended for it to escalate. In sum, the State presented evidence that Chad and perhaps Trey hired three "hitmen" from Georgia to assault Andrade because of a $100,000 drug debt.

To whatever degree Trey has less complicity in the murder, the evidence nevertheless supports a conclusion that he knowingly participated in the events lead-ing up to the murder and knowingly assisted the assailants as they fled the state.

Trey and Chad contend that their level of involvement in the offense suggests that a lesser bail is appropriate because they hired the assailants only to "beat up" Andrade and because they did not participate in the shooting. We agree that this is a consideration.

Nevertheless, the evidence surrounding this drug-related killing suggests the need for a fairly high bail to ensure both Trey's and Chad's appearance. However, the evidence also suggests that a higher bail may be more appropriate for Chad than for Trey due to their respective levels of involvement in the entire transaction.

## ABILITY TO MAKE BAIL

A bondsman testified that he charges a fee of ten percent of the amount of bail to make a bond. He met with Willie, and they determined that the Davis family could raise enough money to cover $300,000 in bail ($150,000 apiece).

Trey testified that $11,800 was seized from him when he was arrested and that he has $11,000 in the bank. These are his only resources.[2] On cross-examination, the State inquired about Trey's work income before his injury and about other resources. Trey testified that he earned between $200 and $400 per month on average and that he had received a $42,000 settlement from an insurance company about ten months before the bail hearing for injuries sustained in a collision. The $11,000 balance of his bank account is all that remains of the settlement, and he was unable to provide much detail regarding how he spent the other $31,000.

---

**2.** The bondsman was unsure whether Willie included Trey's funds in determining how much the family could raise to make bail.

Chad presented no additional evidence regarding his own financial circumstances beyond the testimony of the bondsman. However, the papers included with the search warrant for Chad's residence reflect that the value of this property is $127,550 and that the property is held in the name of Shanna Hawkins c/o W.E. Davis.[3]

Trey and Chad contend that their ability to each afford only $150,000 in bail is undisputed. The State counters that consideration should be given to the value of Chad's residence and the property seized from his home, the $31,000 in funds which Trey spent, and the $100,000 "debt" owed them by Andrade. The State contends that such consideration makes it "reasonable to assume that the Appellant indeed has large financial resources [from] which he can possibly post bond."

■ However, the Court will not imply the existence of financial resources absent evidence of their existence. The property seized from Chad is not presently available to him as a resource. Nor is the $31,000 which Trey has already spent from his insurance settlement. Perhaps Chad's residence could be sold or encumbered to raise money for bail, but the record reflects that title to this property is held in another's name.

Accordingly, we conclude that Trey presented largely uncontroverted evidence that he could afford to make bail in an amount no greater than $150,000. Thus, the evidence on this factor tends to support a reduction in the current bail as to Trey. Although Chad is alleged to have "control" over the San Jacinto County residence, the evidence reflects that title to that property is held by another. Accordingly, the evidence on this factor likewise tends to support a reduction of bail as to Chad.

## FUTURE SAFETY OF THE COMMUNITY

Trey does not address this factor in his brief. Chad contends that the court can set reasonable conditions such as electronic monitoring to ensure the safety of the community.

The State counters that the circumstances of the offense and the evidence regarding Trey's and Chad's involvement in narcotics trafficking suggest that bail in a higher amount is necessary to ensure the safety of the community. *See Maldonado v. State,* 999 S.W.2d 91, 97 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd); *Ex parte Emery,* 970 S.W.2d 144, 146 (Tex. App.-Waco 1998, no pet.).

We agree with the State that the evidence pertinent to this factor tends to support bail in a higher amount.

## PRIOR CRIMINAL HISTORY

Trey has one prior misdemeanor conviction for disorderly conduct, which was reduced from a charge of unlawfully carrying a weapon.

Chad received deferred adjudication community supervision in 1994 for unlawfully carrying a weapon, felony community supervision in March 1996 for possession of between four ounces and five pounds of marihuana, and misdemeanor community supervision in May 1996 for possession of less than twenty-eight grams of an unidentified controlled substance. The trial court revoked Chad's felony community supervision in March 2002. Among the pertinent allegations in the revocation motion were assertions that Chad left the State without the court's permission [4] and submitted a

---

**3.** Willie Davis's tour bus is also registered in the name of "W. E. Davis."

**4.** Chad was arrested on the revocation warrant in Georgia.

urine specimen not his own to pass the required urinalysis.

Trey's criminal history does not indicate the need for a particularly high bail. Chad's on the other hand suggests that a high bail is necessary, that he poses a flight risk, and that he might disregard any conditions of bail imposed by the trial court.

## COMPARISON TO BAIL IN OTHER CASES

The parties cite numerous cases published and unpublished which they contend provide guidance here. We agree that comparison with other cases is appropriate. *See Beard,* 92 S.W.3d at 571; *Emery,* 970 S.W.2d at 145–46. However, we will limit our comparison to published[5] decisions no more than five years' old because these decisions are the most relevant in terms of current economic indicators.[6]

Trey cites *Ex parte Simpson* as a relevant case in which bail was approved in the amount of $600,000. 77 S.W.3d 894 (Tex. App.-Tyler 2002, no pet.). In *Simpson,* the court approved this amount for "a brutal, gang-related murder" where the defendant's correspondence indicated that he intended to renew his participation in the gang or flee if released on bail. *Id.* at 897. Trey contends that his bail should be lower than Simpson's because Simpson directly participated in the murder unlike Trey and because there is no evidence in Trey's case of an intent to flee or of gang membership.

Trey, Chad and the State all cite *In re Henson,* 131 S.W.3d 645 (Tex.App.-Texarkana 2004, no pet.). There, the defendant participated in a "brutal triple homicide" committed during an after-hours robbery of a restaurant. *Id.* at 646. The trial court set bail at $750,000 for each of three counts. The appellate court examined other cases and balanced the severity of the crime with several more positive factors (the defendant's lack of a criminal record, the fact that he did not wield the murder weapon, and his family and community ties). After doing so, the court concluded that bail of $500,000 for each count was more appropriate. *Id.* at 648–51.

Trey and Chad cite *Henson* for the proposition that $1,000,000 is simply too high when compared to the $500,000 bail approved in that case. The State cites *Henson* with reference to the cumulative total ($2,250,000 reduced to $1,500,000) rather than the amount of bail set for each count. We agree that *Henson* has some bearing on this case because there was no evidence that the defendant in that case had a prior criminal record, the defendant did not personally wield the murder weapon, and the defendant had "fairly strong" community ties. *Id.*

Trey also cites *Ex parte Beard* as a relevant decision. 92 S.W.3d 566. In *Beard,* bail was set at $8,000,000 for a rather wealthy defendant charged with the capital murder of her husband. The appellate court balanced the seriousness of the charge with the court's conclusions that (1) the defendant had a minor crimi-

---

**5.** Although unpublished decisions may be cited, they have "no precedential value." Tᴇx R.Aᴘᴘ. P. 47.7. Because of this and because numerous published decision are available for comparison, we will not include the unpublished decisions in our analysis.

**6.** Chad for example cites a 1985 decision among others. Perhaps the economic indica-

tors of that period were similar to those of the present, but the record contains no evidence to substantiate this. Absent such evidence, we will confine our review to more recent decisions. *Cf. Ex parte Henson,* 131 S.W.3d 645, 648–49 (Tex.App.-Texarkana 2004, no pet.) (declining to consider pre–1991 decisions cited by the appellant).

nal history, (2) did not pose a danger to the community, (3) did not pose a flight risk, and (4) was unusually wealthy (as compared to "most criminal defendants"). After doing so, the court held that the bail was too high and ordered it lowered to $500,000. *Id.*, 92 S.W.3d at 572–74.

The State cites two cases in which courts approved bonds of $3,000,000 and $2,500,000 respectively. *Ex parte Reyes*, 4 S.W.3d 353, 356 (Tex.App.-Houston [1st Dist.] 1999, no pet.); *Maldonado*, 999 S.W.2d at 97. However, these cases involved defendants who were both arrested with 721 kilograms of cocaine. Evidence was offered at the bail hearings in these cases that this quantity of cocaine had a street value of between $11,000,000 and $87,000,000, depending on how it was packaged and sold. *Reyes*, 4 S.W.3d at 355 ($56,000,000 to $87,000,000); *Maldonado*, 999 S.W.2d at 95 ($11,000,000 to $72,000,000).

At best, Trey's and Chad's case involves a drug transaction worth $100,000. Although the State offered evidence that Trey and Chad were engaged in trafficking "pure" cocaine from Mexico, the State offered no evidence of the quantity or value of the cocaine they are believed to be trafficking. Thus, *Reyes* and *Maldonado* are of little value for setting bail in Trey's and Chad's cases.

### TREY'S BAIL

■ Trey presented evidence that he: (1) has lived in Brazos County for ten years; (2) has a job in the oilfield business; (3) did not participate directly in Andrade's murder; (4) has inadequate financial resources to make bail of $1,000,000; (4) has a relatively minor criminal history; and (5) has complied with the terms of a prior appearance bond. This evidence tends to support a reduction of bail.

Conversely, the record contains evidence that Trey: (1) is engaged in narcotics trafficking; (2) knowingly participated in Andrade's murder; and (3) poses a danger to the community because of his involvement in narcotics trafficking and his participation in the murder.

After considering this evidence and comparing it to other bail cases, we hold that the court abused its discretion by setting Trey's bail at $1,000,000. *Cf. Henson*, 131 S.W.3d at 648–51; *Simpson*, 77 S.W.3d at 897. We reverse the judgment as to Trey and render judgment setting bail at $500,000. *See Henson*, 131 S.W.3d at 651.

### CHAD'S BAIL

■ Chad presented evidence that he did not participate directly in Andrade's murder and has inadequate financial resources to make bail of $1,000,000. Conversely, the record contains evidence that he: (1) lives in another county; (2) may disregard any conditions of an appearance bond as he did the conditions of community supervision; (3) is engaged in narcotics trafficking; (4) knowingly participated in Andrade's murder; (5) poses a danger to the community because of his involvement in narcotics trafficking and his participation in the murder; and (6) has a prior criminal history.

After considering this evidence and comparing it to other bail cases, we hold that the evidence with regard to Chad supports a higher bail than for Trey. Nevertheless, it appears that $1,000,000 is too high when compared with other bail cases. Accordingly, we conclude that the court abused its discretion by setting Chad's bail at $1,000,000. *Cf. Henson*, 131 S.W.3d at 648–51; *Simpson*, 77 S.W.3d at 897. We reverse the judgment as to Chad and render judgment setting bail at $750,000.

Chief Justice GRAY dissenting.

TOM GRAY, Chief Justice, dissenting.

This is a case in which the Court simply disagrees with the trial court, so it substitutes its judgment for that of the trial court. Because the evidence shows substantial connection to international and interstate drug trafficking by the defendants, thus raising serious concerns about being a flight risk, I cannot say the trial court abused its discretion in setting a substantial bail.[1] I would not hold the trial court abused its discretion. I therefore respectfully dissent.

---

1. There is also an unanswered question. By what authority does an appellate court set the appropriate amount for bail? In every other context where the trial court exercises a range of discretion, upon a finding of an abuse, we reverse and remand for further proceedings—but not in setting bail.