

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-18-00110-CR

EX PARTE SHANIA MIKEL
CRAVEN

----------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 18-1424-367

----------

## MEMORANDUM OPINION[1]

----------

Shania Mikel Craven appeals the trial court's denying her requested bail reduction. *See* Tex. R. App. P. 31. She contends that the $200,000 pretrial bail is excessive and violates the United States and Texas Constitutions and the Texas Code of Criminal Procedure. *See* U.S. Const. amend VIII; Tex. Const. art. I, §§ 11, 13; Tex. Code Crim. Proc. Ann. arts. 1.07 (West 2005), 17.15 (West 2015). We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## Procedural Background

The Little Elm Police Department in Denton County arrested Shania Craven on February 2, 2018, for Christopher Singh's murder; the next day, a magistrate set her bond at $200,000. The trial court found that Shania[2] was indigent and appointed her counsel on February 7, 2018.

On February 15, 2018, Shania filed an "Application for Writ of Habeas Corpus or in the Alternative Motion for Reasonable Bail." At her March 1, 2018 hearing, Shania requested a $50,000 bond. The trial court denied her any relief. This appeal followed.

## Information Before the Court

### *The Affidavit Supporting the Arrest Warrant*

In the arrest-warrant affidavit, Officer Candace Belt stated that on Sunday, January 28, 2018, at about 8:23 p.m., Little Elm police responded to a reported stabbing at a particular apartment complex in Little Elm, Denton County. As Officer Belt reported, when Officer M. Lescallett went into the apartment, he saw a male, later identified as Christopher Singh, on the floor with a stab wound to the chest; he also saw a female—Shania—and a six-month-old baby. Officer Lescallett and other responding officers administered CPR to Christopher, but by

---

[2]To avoid confusion between the defendant and her mother, Shandra Craven, we will use their first names, as we will also do when referring to the victim and his father.

2

the time EMS arrived, Christopher was no longer breathing. EMS's attempts to revive him failed, and Christopher was later pronounced dead.

Officer Belt further averred that Shania had called 911 and stated that she and her boyfriend were fighting, that she had a knife in her hand, and that she had stabbed him. Officer Belt added that Shania made the same confession to her mother, Shandra Craven, and to Officer Belt herself.

*The Denton County Bail Guidelines*

The Denton County bail guidelines recommended a $50,000 bond for a "First Degree (3g)" offense, of which murder was one.[3] *See Ex parte Mohammed*, No. 02-15-00151-CR, 2015 WL 5093313, at *2 n.2 (Tex. App—Fort Worth Aug. 27, 2015, no pet.) (mem. op., not designated for publication).

*Shandra Craven's Testimony*

Shandra Craven, Shania's mother, testified that she had lived in Mesquite, Texas, for four years and that Shania had lived with her before Shania and

---

[3]The reference to "3g" is to former section 3g(a)(1) of article 42.12 of the code of criminal procedure, which provided a list of certain serious and violent crimes that were ineligible to receive judge-ordered community supervision and that were often referred to as "3g offenses." *Plummer v. State*, 410 S.W.3d 855, 861 n.42 (Tex. Crim. App. 2013). The legislature repealed article 42.12 effective September 1, 2017. Act of May 26, 2015, 84th Leg., R.S., ch. 770, §§ 3.01, 4.02, 2015 Tex. Sess. Law Service 2320, 2394 (West); Act of May 18, 2017, 85th Leg., R.S., ch. 324 §§ 23.012(d), 23.013(d), 23.014(b), 23.015(b), 23.016(h), 23.017(b), 23.018(b), 23.019(b), 23.020(b), 23.021(b), 2017 Tex. Sess. Law Service 841, 952–59 (West); Act of May 24, 2017, 85th Leg., R.S., ch. 877, § 11(a), 2017 Tex. Sess. Law Service 3652, 3657 (West). Those provisions are currently codified in article 42A.054 of the code of criminal procedure. Tex. Code Crim. Proc. Ann. art. 42A.054 (West 2018). Murder is among the offenses listed. *Id.* art. 42A.054(a)(2).

3

Christopher's relationship began.[4] If Shania bonded out, Shandra expected Shania to live with her. Also living with Shandra were her grandson and another daughter, who has "global developmental delay" and epilepsy.

Before Shania's arrest, Shandra and Shania worked at the same nightclub in Arlington.[5] Shania had worked there as a server for about the last two years, and Shandra had worked there the past four years. If Shania bonded out, their employer had told Shandra that Shania could return to work there. Shandra, as a manager, made $4 per hour plus tips; Shania, who was just an employee, made less than that plus tips. Shania had no other means of income and no assets of any kind. As a manager, Shandra testified that she (Shandra) made anywhere from $1,500 to $1,700 per month.

Shania's bond was set at $200,000, after which Shandra had been trying to post bail and had contacted numerous bail-bond companies. The bond companies all told her basically the same thing: Shandra would need $20,000 cash and collateral. Shandra testified that her family was basically a "paycheck-to-paycheck" one and that she did not have $20,000 in cash. After selling off many of her personal possessions, Shandra had managed to raise only between $500 and $600.

---

[4]Mesquite is located in Dallas and Kaufman Counties.

[5]Arlington is located in Tarrant County.

Shania's immediate family was in Mesquite with Shandra, but her extended family was in Tulsa, Oklahoma, and in California. Shandra testified that Shania had graduated from high school in Tulsa in 2010, went to college for about two semesters, and then started working. Shandra's mother and brother lived in Oklahoma; her cousins lived in California.

While living in Oklahoma, Shania twice had contact with law enforcement. She was arrested for misdemeanor possession of marijuana, got probation, and completed it.

The second matter, in 2012, was more complicated. As Shandra put it, Shania's "vehicle was used in a murder." Shania became scared for her life, and the Oklahoma authorities placed her in a witness-protection program, eventually relocating Shandra and Shania to California.

Most recently, Shandra maintained, Shania had been a victim of family violence, relying for evidence (which we discuss further below) on Defendant's Exhibits 3 and 4—documents concerning victims' rights that Shania had received from the Frisco Police Department and from the Denton County District Attorney's Office. Shandra also testified that Shania was taken to the hospital for knife wounds after the incident in which Christopher died, and spent several days there before she was arrested for Christopher's murder.

According to Shandra, both she and Shania had cooperated fully with the Little Elm Police Department, and if Shania were released, Shandra would help

see to it that Shania was present at all court appearances. Shandra was unaware of any past instance when Shania had not appeared for a scheduled court date.

Shandra wanted the court to follow the bail guidelines and set Shania's bail at $50,000, although she acknowledged that even then, she did not have the $5,000 that would be needed to make that lower bond. Shandra also thought that Shania would be more helpful to her defense counsel if she were not incarcerated. Shandra also wanted Shania to help take care of her 16-year-old sister.

*The 2012 Oklahoma Incident:*

*Application for Arrest of Material Witness; Material-Witness Warrant*

An August 2012 "Application for Arrest of Material Witness" from Oklahoma shed additional light on Shania's second encounter with law enforcement there. That case involved not just a murder, but a double murder in which the defendants used Shania's vehicle. Shania did not come forward until four days later, and at the time of her arrest the police found license plates from another vehicle on her car and a .380 caliber semi-automatic handgun inside it.

The State of Oklahoma sought to arrest Shania as a witness because "it [was] doubtful that she would willingly accept service of a subpoena and may otherwise refuse to appear in a criminal proceeding" since one of the defendants had threatened her. The affiant stated that Shandra had indicated that they were going to move out of state, "which would thwart the State's ability to locate [Shania] for court testimony."

6

A later September 2012 "Application for Material Witness Warrant" from Oklahoma provided more information about Shania's involvement in the murders: she "was in the vehicle and was an eye witness to the events immediately preceding the shooting and to the events immediately after the shooting." After Shania's arrest as a material witness, she posted bond, relocated out of state with her mother for her safety, and was in contact with the Federal Bureau of Investigation. But after Shania later had an argument with Shandra, she left their location and failed to contact her attorney, the State of Oklahoma, the FBI, or her mother.

*The Singhs' Letters Opposing Reduced Bond and Detailing Problems*

The trial court also had two letters before it, one from Christopher's parents (Prem and Kampta Singh), and another from only Kampta, Christopher's father.

In the first letter, Prem and Kampta asked the court not to lower Shania's bond but instead to increase it significantly. Asserting that Shania had a history of showing up at their house unannounced and damaging their property, the Singhs also recounted an instance when Shania showed up at Christopher's office and frightened the management and employees sufficiently for them to call the police. Prem and Kampta wrote that they feared that Shania would threaten or hurt them.

Kampta also wrote a second letter cataloguing various events that spanned the whole of 2017 until Christopher's January 2018 death. Kampta described how on January 1, 2017, Shania appeared at his house and acted

belligerently towards Christopher, at which point Christopher told his parents that Shania was pregnant. But Shania remained so agitated that Kampta's neighbors came out of their homes to see what the commotion was about. Eventually Kampta called the police, who showed up and instructed Shania to leave.

In a June 2017 incident, according to Kampta, Christopher left the apartment that he shared with Shania, only to have Shania follow him in her vehicle and ram his car. After Christopher pulled over, Shania's behavior caused someone to call the police.

The next month, on July 4, 2017, Christopher called his father to say that Shania was upset, had thrown him out of their apartment, and was cutting up his clothes. Kampta's letter noted that all this was going on while Christopher's child was in the apartment with them.[6] Although Christopher and his son came to the Singhs' house several hours later, Christopher returned to the apartment later that day to get some of his belongings. Shania then hit Christopher with an iron and pulled a knife on him, as Christopher reported to his father when he once more came back to his parents' house, now with scrapes and bruises around his neck. Shania showed up at the Singhs' house shortly afterward, provoking another scene that ended with Kampta's taking Christopher to the Little Elm police station to file a report.

---

[6]This was apparently not the same child Christopher fathered with Shania, who gave birth three days later.

Kampta, his wife, and their daughter left for vacation on July 6, 2017, while Christopher stayed at their house; Kampta understood that Christopher planned to move back home.

On July 7, 2017, Shania gave birth with Christopher present. A mere week later, with the Singhs still out of town and Christopher at the house, Kampta told Christopher to call the police when he learned through real-time phone video that Shania was in the Singhs' backyard, knocking over flower pots, banging on windows, and destroying the patio area. She even damaged Christopher's car by throwing an exercising weight at it. After the police arrived, they told Shania to leave but did not arrest her because she had a newborn child.

The litany continued: on July 31, 2017, after Shania and Christopher had argued at their apartment, Shania came to the Singhs' home and tried to leave the baby at their front door. Kampta called the police, who came immediately and told Shania that she had to take the baby and leave. Shania was issued a criminal-trespass warning.[7]

Shania showed up at Christopher's workplace a month later to argue and, while there, vandalized his car. Christopher called the police, and Christopher's human-resources representative, concerned for everyone's safety, also made a report.

---

[7]The warning shows that Kampta lived in Frisco, which is in Collin and Denton Counties.

Finally, on January 28, 2018, Christopher called Kampta around 6:49 p.m. to say that he was coming over because Shania was arguing; while Kampta was talking to Christopher, the phone went dead. The coroner's office called at 2:30 a.m. the next morning to report that Christopher's girlfriend had stabbed him to death.

*Shania's Exhibits*

At the bond-reduction hearing, through counsel[8] Shania produced a 2009 emergency protective order against Christopher, although the victim was someone other than Shania. She also produced records of five criminal proceedings against Christopher: (1) a February 11, 2015 judgment for driving while intoxicated–second offense, (2) a 2015 judgment for unlawfully carrying a weapon, (3) a second 2015 judgment for unlawfully carrying a weapon, (4) a 2015 judgment for possession of less than two ounces of marijuana, and (5) a January 16, 2015 DWI conviction.

Included among her exhibits was a police incident report for the July 4, 2017 confrontation at the Singhs' house, in which the police identified Shania as the victim and Kampta, who had allegedly threatened to kill her, as the suspect.[9]

Finally, Shania produced Defendant's Exhibits 3 and 4: an undated Denton County "Violent Crime Victim Information" sheet and a July 6, 2017 letter

---

[8]Shandra was the only live witness.

[9]This was the same event that gave rise to Kampta's taking Christopher to the Little Elm police department to file a report of his own.

addressed to her from the Frisco Victim Assistance Program. Neither document names a suspect, but the July 6 letter provides a report number that corresponds to the July 4, 2017 incident report identifying Kampta as the suspect.

## Standard of Review

We review a trial court's pretrial bail determination under an abuse-of-discretion standard. *Ex parte Rubac*, 611 S.W.2d 848, 850 (Tex. Crim. App. [Panel Op.] 1981); *Ex parte Green*, No. 02-13-00474-CR, 2014 WL 584960, at *2 (Tex. App.—Fort Worth Feb. 13, 2014, no pet.) (mem. op., not designated for publication); *Ex parte Davis*, 147 S.W.3d 546, 548 (Tex. App.—Waco 2004, no pet.). A habeas applicant bears the burden of proving that her bail is excessive. *Rubac*, 611 S.W.2d at 849; *Green*, 2014 WL 584960, at *2; *Davis*, 147 S.W.3d at 548.

## Article 17.15's Bail-Related Factors

Article 17.15 lists five factors to be considered in determining what bail is appropriate:

> 1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.
>
> 2. The power to require bail is not to be so used as to make it an instrument of oppression.
>
> 3. The nature of the offense and the circumstances under which it was committed are to be considered.
>
> 4. The ability to make bail is to be regarded, and proof may be taken upon this point.

11

5. The future safety of a victim of the alleged offense and the community shall be considered.

Tex. Code Crim. Proc. Ann. art. 17.15.

Other pertinent factors include family and community ties, work history, length of residence in the county, prior criminal record, conformity with conditions of prior bonds, and any aggravating circumstances of the offense. *Rubac*, 611 S.W.2d at 849–50; *Green*, 2014 WL 584960, at *2; *Davis*, 147 S.W.3d at 548.

We will review the trial court's decision in light of the above factors.

*Sufficiently High to Give Reasonable Assurance of Appearance*

"Bail should be set high enough to give reasonable assurance that the defendant will appear at trial, but it should not operate as an instrument of oppression." *Ex parte Brown*, 959 S.W.2d 369, 371 (Tex. App.—Fort Worth 1998, no pet.). A defendant's community ties and work history bear on the adequacy of bail to give reasonable assurance he will appear. *See Ex parte McCullough*, 993 S.W.2d 836, 837–38 (Tex. App.—Waco 1999, no pet.). A defendant's compliance with the conditions of any prior bonds likewise bears on this issue. *Richardson v. State*, 181 S.W.3d 756, 759 (Tex. App.—Waco 2005, no pet.).

With Christopher's death, Shania had no ties to Denton County. Shania had a mother and sister in Mesquite and a job in Arlington, but these cities are in other counties. Although the record is unclear, Shania's child appeared to be living with Shandra in Mesquite.

12

Commendably, Shania had completed probation for her earlier Oklahoma misdemeanor offense. On the other hand, she had absconded in California while in a witness-protection program, which seems to have prompted the September 28, 2012 "Application for Material Witness Warrant."

Shania's job as a server at an Arlington nightclub did not appear to be the type of job that would anchor her to Texas.

Shania had relatives in Oklahoma and California. The record did not show whether Shania still considered Oklahoma a dangerous place to live, nor did it show why Shania and Shandra left California for Texas.

Finally, in the case at hand, if Shania failed to appear at trial, it would not be her assets and savings at risk but her mother's. *See Brown*, 959 S.W.2d at 373. That is, Shania's mother, not Shania herself, assumed all the financial risk if Shania again absconded.

Overall, Shania's ties to Denton County were nonexistent, and her ties to Texas as a whole were tenuous. We hold that the trial court was within its discretion to set a fairly high bail to ensure Shania's appearance.

*Not So High as to Constitute an Instrument of Oppression*

Bail set in a particular amount becomes "oppressive" when it is "based on the 'assumption that [the accused cannot] afford bail in that amount and for the express purpose of forcing [the accused] to remain incarcerated pending [trial].'" *McCullough*, 993 S.W.2d at 837 (quoting *Ex parte Harris*, 733 S.W.2d 712,

13

714 (Tex. App.—Austin 1987, no pet.)). Nothing in our record indicates that the trial court rendered its decision on this basis.

Furthermore, for a murder offense, a $200,000 bond is not excessive. *See Ex parte McBride*, No. 12-07-00241-CR, 2007 WL 4216370, at *3 (Tex. App.—Tyler Nov. 30, 2007, no pet.) (mem. op., not designated for publication) (holding trial court did not abuse its discretion by reducing defendant's bond for murder to $250,000); *Ex parte McFarland*, No. 04-03-00154-CR, 2003 WL 21658599, at *3 (Tex. App.—San Antonio July 16, 2003, no pet.) (mem. op., not designated for publication) (holding bail for murder charge of $500,000 was excessive; reducing bond to $250,000); *Ex parte Ortiz*, No. 01-02-00087-CR, 2002 WL 937676, at *3–4 (Tex. App.—Houston [1st Dist.] May 7, 2002, no pet.) (not designated for publication) (holding bail of $250,000 for murder charge was not excessive); *Ex parte Lebron*, No. 04-97-00087-CR, 1997 WL 311488, at *1–2 (Tex. App.—San Antonio June 11, 1997, no pet.) (not designated for publication) (holding $250,000 bail for murder charge was not excessive).

*Nature and Circumstances of the Offense*

In Shania's brief, she attempts to portray Christopher as a domestic abuser. But the only theoretically supporting evidence of this involved another woman about eight years earlier. Other of Shania's own evidence showed that it was Kampta, not Christopher, who threatened her—if one believed Shania's allegations.

14

In contrast, Kampta's letters showed that in the context of Shania and Christopher's relationship, Shania was the one displaying rage and violence: even before she killed him, Shania had hit Christopher with an iron and pulled a knife on him.

Shania also suggests to us that she might have killed Christopher in self-defense. But Shania's statements to the 911 operator, her mother, and Officer Belt were that she and Christopher got into a fight and that she killed him. She said nothing about self-defense.

Murder carries a potential maximum sentence of life imprisonment and a fine of up to $10,000. *See* Tex. Pen. Code Ann. §§ 12.32, 19.02(c) (West 2011). The potential life sentence and Shania's confessions suggest that a high bail amount is appropriate.

### *Ability to Make Bail*

The record showed that Shania was indigent and could not have made even the $50,000 bond she requested. Although a defendant's ability to make bail is a factor to consider, inability to make bail, even to the point of indigence, does not control over the other factors. *Ex parte Charlesworth*, 600 S.W.2d 316, 317 (Tex. Crim. App. [Panel Op.] 1980); *Davis*, 147 S.W.3d at 548. "Simply because a defendant cannot meet the bond set by the trial court does not automatically render the bail excessive." *Brown*, 959 S.W.2d at 372. If the ability to make bond controlled, then the accused—not the trial court—would determine

what her bond should be. *Id.* (quoting *Ex parte Miller*, 631 S.W.2d 825, 827 (Tex. App.—Fort Worth 1982, pet. ref'd)).

The evidence on this factor tends to support a further reduction of bail, although no other factor weighs in Shania's favor.

*Community's Future Safety*

Shania has now been involved to one degree or another in the violent deaths of three people. The trial court was not obliged to attribute this to coincidence or extraordinarily bad luck.

The record is not well developed on Shania's exact role in the two Oklahoma murders. Although her brief portrays her as nothing more than a witness, Shania herself apparently feared being labelled a party to those offenses.

Here, Shania killed Christopher with a knife by stabbing him in the chest. According to Kampta, this was not the first time that Shania had pulled a knife on his son during a quarrel. Also according to Kampta, Shania regularly behaved erratically, violently, and impulsively. Both he and his wife were afraid of her.

The evidence pertinent to this factor tends to support the trial court's setting bail in a higher amount.

*Prior Criminal History*

Shania had a single conviction for misdemeanor possession of marijuana. On the other hand, as noted above, her past raises concerns, some quite serious, about her behavior and judgment.

16

## Conclusion

The offense—murder—is serious. Shania potentially faces life imprisonment. Her ties to Denton County are nonexistent, and her ties to Texas are weak. Given the evidence showing Shania's volatile and violent behavior, the trial court could reasonably conclude that the community needed protecting. After considering the article 17.15 factors and the record before us, we cannot say the trial court abused its discretion by refusing to reduce Shania's bail to $50,000. Accordingly, we overrule her sole issue and affirm the trial court's ruling.

/s/ Elizabeth Kerr
ELIZABETH KERR
JUSTICE

PANEL: KERR, PITTMAN, BIRDWELL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: June 21, 2018

17