**Ex Parte Brent BENEFIELD, Appellant.**

**No. PD–0147–13.**

Court of Criminal Appeals of Texas.

June 26, 2013.

Brennon D. Brady, Office Of The Public Defender, Wichita Falls, TX, for Appellant.

District Attorney Wichita County, Maureen Shelton, Wichita Falls, TX, for the State.

COCHRAN, J., filed a statement concurring in the refusal of the petition for discretionary review.

I agree with the Court's decision to refuse Mr. Benefield's petition for discretionary review because his grounds for review, as written, do not merit relief. However, because this case raises several legitimate constitutional concerns about judicial review of the pretrial-bond and pretrial-release processes, I write briefly to discuss whether and why the pretrial-bail process has perhaps gone astray of its original statutory purpose.

### I.

After his wife left for work on February 8, 2012, Brent Benefield—the primary day-time caretaker of the couple's infant son—noticed that his son was not breathing and was coughing up blood. He called 911. The four-month-old baby was admitted to the hospital with "numerous injuries to his body including a brain injury that resulted in a subdural hematoma inside his skull as a result of blunt force trauma." He also had "retinal hemorrhages in both

eyes, along with swelling in the brain." The baby died four days later. The autopsy report listed the cause of death as "closed head injury due to the blunt force trauma to the head and brain." The medical examiner concluded that the manner of death was homicide.

Two months later, Mr. Benefield was arrested and charged with injury to a child by causing seriously bodily injury or death. Initially, the bail was set at one million dollars. Mr. Benefield filed an application for a writ of habeas corpus, claiming that the amount of bail was excessive. He offered evidence from three witnesses to support his argument that he should be released on his own recognizance. After the hearing, the trial judge lowered the bail to $200,000. Not satisfied with that result, Mr. Benefield appealed to the court of appeals, which affirmed the trial judge's bail.[1] Mr. Benefield then filed a petition for discretionary review in this Court.[2]

## II.

The early common-law history of the right to pretrial bail showed "a profound regard for a man's personal freedom."[3] In England, a defendant who qualified for bail was "almost invariably" released by the sheriff, both for the sake of the accused, but also to avoid the "costly and troublesome" nature of imprisoning the accused.[4] Because English sheriffs sometimes abused their power to grant bail, the 1275 Statute of Westminster authorized a general right to bail for all offenses "for which one ought not to lose life nor member" or when the accusation was based on "light suspicion."[5] During the early American era, state bail systems were used solely "to ensure the appearance of the accused at trial."[6]

Beginning in the mid-twentieth century, Congress and the states began to authorize pretrial detention for certain particularly heinous crimes and particularly dangerous defendants, in part because some judges had intentionally set bail so high that a prisoner could not realistically pay it and thus courts were employing their own, unconstitutional form of pretrial deten-

---

1. *Ex parte Benefield*, No. 02–12–00242–CR, 2013 WL 173792 (Tex.App.-Fort Worth Jan. 17, 2013) (not designated for publication).

2. Mr. Benefield raised the following issues in his petition for discretionary review:
   1. The court should consider the weakness of the State's case as a part of the "nature and circumstances" of the offense when it sets bail, and
   2. The Court of Appeals created a new and impossible standard of proof by demanding that Benefield prove by direct evidence that the trial court intended to keep him incarcerated.

3. William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 ALB. L.REV. 33, 33 (1977).

4. *Id.* at 41–42.

5. *See* Heath Coffman, *Note and Comment: A Look at the New Texas Constitution Article I, Section 11B*, 59 BAYLOR L.REV. 241, 245 (2007).

6. *Id. See, e.g., Stack v. Boyle*, 342 U.S. 1, 5, 72 S.Ct. 1, 96 L.Ed. 3 (1951) (the purpose of bail is the "assurance of the presence of an accused" at trial); *Hudson v. Parker*, 156 U.S. 277, 285, 15 S.Ct. 450, 39 L.Ed. 424 (1895) ("a person accused of crime shall not, until he has been finally adjudged guilty in the court of last resort, be absolutely compelled to undergo imprisonment or punishment"); *United States v. Barber*, 140 U.S. 164, 167, 11 S.Ct. 749, 35 L.Ed. 396 (1891) ("in criminal cases it is for the interest of the public as well as the accused that the latter should not be detained in custody prior to his trial, if the government can be assured of his presence at that time"); *Ex parte Milburn*, 34 U.S. (9 Pet.) 704, 710, 9 L.Ed. 280 (1835) ("[a] recognizance of bail, in a criminal case, is taken to secure the due attendance of the party accused").

tion.[7] Not only did that ploy violate the Excessive Bail Clause of the federal constitution, it also "cast[ ] doubt on the honesty of the American criminal justice system and prevent[ed] the development of objective standards of dangerousness."[8]

Texas, like Congress, enacted constitutional provisions that allow pretrial detention without bail for some selected crimes and defendants[9] and ensure that all other defendants may be released before trial under a personal recognizance bond or appropriate bail. Article 17.15 of the Texas Code of Criminal Procedure sets forth the proper criteria for determining bail.[10] The "primary purpose" of bail is to ensure a defendant's presence at trial.[11] And, as part of "the nature of the offense," the length of the potential sentence is one factor to consider in the bail-setting decision.[12] Other "pertinent factors" include a defendant's family and community ties in the area, work record, length of residency, prior criminal record, and ability to make the bond.[13] On appeal or in a habeas proceeding, the defendant has the burden to prove that bail is excessive.[14]

However, the citizen who has been accused, but not convicted, has a "strong interest in liberty."[15] Bail may not be used as "an instrument of oppression"[16] to keep an accused "off the streets" or to coerce a plea. The Supreme Court has explained that "[t]he time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces

7. *See* Steven R. Schlesinger, *Bail Reform: Protecting the Community and the Accused*, 9 HARV. J.L. & PUB. POL'Y 173, 188 (1986).

8. *Id.*

9. *See* TEX. CONST. art. 1, § 11a (stating that, if certain procedures are followed, bail may be denied to "[a]ny person (1) accused of a felony less than capital in this State, who has been theretofore twice convicted of a felony, the second conviction being subsequent to the first, both in point of time of commission of the offense and conviction therefor, (2) accused of a felony less than capital in this State, committed while on bail for a prior felony for which he has been indicted, (3) accused of a felony less than capital in this State involving the use of a deadly weapon after being convicted of a prior felony, or (4) accused of a violent or sexual offense committed while under the supervision of a criminal justice agency of the State or a political subdivision of the State for a prior felony[.]").

10. *See* TEX.CODE CRIM. PROC. art. 17.15. The statute provides:

1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.
2. The power to require bail is not to be so used as to make it an instrument of oppression.
3. The nature of the offense and the circumstances under which it was committed are to be considered.
4. The ability to make bail is to be regarded, and proof may be taken upon this point.
5. The future safety of a victim of the alleged offense and the community shall be considered.

11. *Ex parte Rodriguez*, 595 S.W.2d 549, 550 (Tex.Crim.App. [Panel Op.] 1980).

12. *Id.*

13. *See* TEX.CODE CRIM. PROC. art. 17.15; *Ex parte Davis*, 147 S.W.3d 546, 548 (Tex.App.-Waco 2004, no pet.) (citing *Ex parte Rubac*, 611 S.W.2d 848, 850 (Tex.Crim.App. [Panel Op.] 1981)).

14. *Ex parte Rubac*, 611 S.W.2d at 849.

15. *United States v. Salerno*, 481 U.S. 739, 750, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

16. *Ex parte Vasquez*, 558 S.W.2d 477, 479 (Tex.Crim.App.1977) (finding that $100,000 bail in 1977 capital-murder proceeding was excessive when defendant testified that he was indigent and that he was merely the getaway driver during the robbery-murder; uncle promised a job if defendant were released and he had no known criminal history or history of failing to appear in court).

idleness;" all the while he is "living under a cloud of anxiety, suspicion, and often hostility." [17] In addition, a pretrial detainee is "hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense." [18] In balancing the accused's due-process interests and the community's safety interests, the Texas Legislature has statutorily ensured that a trial judge will, in the vast majority of cases, release a defendant pre-trial, while giving the trial judge appropriate tools to provide suitable oversight to prevent the accused from fleeing the jurisdiction, intimidating witnesses, committing crimes, or posing a realistic threat to the community.[19]

### III.

At his bail hearing Mr. Benefield presented his case to be released on his own recognizance. Witnesses testified that he was an "extremely loving" father who was "excellent" with his all of his children— overall, a "very good dad." Except for an arrest warrant issued for failure to pay traffic tickets, Mr. Benefield had no criminal history. He had lived in Wichita County for upwards of fifteen years, and had strong family ties in that area. While he had little to no money to post bail himself, family members testified they could help him post bail, within reason.

Mr. Benefield also argued that the State would not be able to prove its case against him. He presented police records showing Benefield's wife had experienced post-partum depression after the birth of their son and had stopped taking her medication shortly before the baby's death, implying that perhaps she caused the child's fatal injuries. Mr. Benefield also introduced into evidence a conversation between his trial attorneys and the pathologist who performed his son's autopsy in which the pathologist explained he was unsure "whether [the State would] be able to come up with legal proceedings because … you have to get into beyond a reasonable doubt realm" and "this is a-you know, kind of out in the gray zone." [20] The State argued against Mr. Benefield's release, stating that he was a flight risk because he was facing a sentence of up to 99 years or life.[21] Mr. Benefield responded by testifying that he would not flee if he was released because he has two young children to take care of. To support his claim, he explained that he was aware of the investigation leading up to his arrest and had "ample opportunity" to flee, but chose not to do so. Indeed, the arresting officers

---

**17.** *Barker v. Wingo*, 407 U.S. 514, 532–33, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

**18.** *Id.* at 533, 92 S.Ct. 2182.

**19.** *See* TEX.CODE CRIM. PROC. arts. 17.43–17.49.

**20.** The pathologist indicated that the infant had several old injuries, which might indicate that Mr. Benefield's wife, a victim of post-partum depression, could have caused both the old and new injuries.

**21.** Of course, every citizen charged with a first-degree felony is facing a sentence of up to 99 years or life. While the seriousness of the charges may be considered in setting bail, they are not alone sufficient to require a pretrial bail of a million dollars or even a bail of $200,000. Intentionally setting bail so high

as to ensure that the defendant cannot pay it violates the Excessive Bail Clause of both the federal and Texas constitutions. *See* U.S. CONST. amend. VIII; TEX. CONST. art. I, § 13. Bail is excessive "if it is set in an amount greater than is reasonably necessary to satisfy the government's legitimate interests." *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex.App.-Austin 2002, pet. ref'd) (citing *United States v. Salerno*, 481 U.S. 739, 753–54, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Jurisdictions that rely heavily upon the offense level in determining the appropriate level of bond may wish to promulgate standardized bail schedules to ensure that all those charged with the same level offense are treated equally.

called Mr. Benefield's home on the day of the arrest and explained they were on their way to arrest him. He patiently awaited their arrival and peacefully allowed them to arrest him.

This case raises legitimate constitutional concerns about our pretrial-release system: a citizen, presumptively innocent, may be detained in jail before trial—on the taxpayers' dime [22]—when he would most likely appear for trial if released on his own recognizance.[23] Indeed, the ABA notes that "[i]t should be presumed that defendants are entitled to release on personal recognizance," although this presumption may be rebutted by "evidence that there is a substantial risk of nonappearance or need for additional conditions." [24] In reality, the possibility of a lengthy prison sentence frequently results in an implicit presumption that a defendant will flee unless a very high bond is set.[25] This is often the case even when

---

**22.** According to the Texas Commission on Jail Standards, in 2011, counties spent an average of $62.79 per day per jail detainee. The total cost to Texas counties to house the average 60,000 inmates per day throughout the state amounted to 12% of each county's annual budget. TEXAS COMMISSION ON JAIL STANDARDS (TCJS), JAIL POPULATION REPORTS (2011).

**23.** Several studies suggest that the failure-to-appear rate between a "release on recognizance" bond and a cash or bail bond are similar. *See* Samuel L. Meyers, Jr., *The Economics of Bail Jumping*, 10 J. LEGAL STUD. 381, 382 (1981) (citing Steven H. Clarke, Jean K. Freeman, & Gary B. Koch, *Bail Risk: A Multivariate Analysis*, 5 J. LEGAL STUD. 341 (1976)); *see also* Esmond Harmsworth, *Bail and Detention: An Assessment and Critique of the Federal and Massachusetts Systems*, 22 NEW ENG. J. ON CRIM & CIV. CONFINEMENT 213 (1996) (surveying a number of release-on-recognizance studies across the country, finding failure-to-appear rates between .7% and 19%; also noting that many times a failure to appear is a "technical" default relating to "family problems, inadequate transportation, forgetfulness, and personal reasons unrelated to a desire to escape possible punishment for crime.").

**24.** AMERICAN BAR ASSOCIATION, CRIMINAL JUSTICE SECTION STANDARDS: PRETRIAL RELEASE, Std. 10-5.1.

In 1966, Congress passed The Bail Reform Act of 1966, which required federal courts to release any defendant charged with a non-capital offense on his recognizance or an unsecured appearance bond, unless the trial judge determined that the defendant would fail to appear for trial under minimal supervision. BUREAU OF JUSTICE STATISTICS, DEP'T OF JUSTICE, FEDERAL PRETRIAL RELEASE AND DETEN-

TION, 1966, at 5 (1999) (citing H.R. Rep No. 1541-89 (1966)). The Act addressed one of the central problems with denying bail: the increased likelihood that defendants will plead guilty, even when they are not, to resolve their cases quickly so they can get out of jail. Defendants who remain in pretrial custody are not only more likely to plead guilty than those who are released pending trial, they are also handicapped in assisting their attorneys to locate witnesses and evidence, and thus less likely to be able to mount a viable defense. *See* Ronald F. Wright, *Trial Distortion and the End of Innocence in Federal Criminal Justice*, 154 U. PA. L.REV. 79, 124–25 (2005). But the provisions of the 1966 Act, designed to encourage greater numbers of pretrial releases, were modified by the Bail Reform Act of 1984 based on increasing concerns about dangerousness. The 1984 Act provided that "the judicial officer *shall* order the pretrial release of the person on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court . . . *unless* the judicial officer determines that such release will not reasonably assure the appearance of the person as required or *will* endanger the safety of any other person or the community." Bail Reform Act of 1984, 18 U.S.C. § 3142(b).

**25.** The trend toward setting ever-higher bonds that result in the accused's inability to obtain pretrial release from jail has been accelerating. "[S]ince 1992, fewer people have been released pretrial without bail, fewer have been granted bail at all, and, of those granted bail, fewer have been able to make the payment." Amanda Petteruti & Nastassia Walsh, *Jailing Communities: The Impact of Jail Expansion and Effective Public Safety Strategies*, JUST. POL'Y INST. 11 (Apr. 2008),

there is significant evidence, as there was in this case, suggesting that the defendant will not flee. Furthermore, a significant proportion of those who are actually convicted of serious felony offenses are placed on community supervision.[26] If the person is non-threatening enough to live in the community *after* he has been convicted of a very serious crime, why is he presumed too threatening to live in that community on his own recognizance *before* he has been convicted of any crime? Is it because the person who *might* commit a crime if released is more threatening than the person who has been convicted of committing a crime?

Finally, it seems far from certain that setting a high bond does a better job of ensuring a defendant's presence at trial than releasing that person on his own recognizance.[27] Empirical studies suggest that simple prophylactic measures can be taken to decrease failure-to-appear rates when defendants are released on their own recognizance.[28] And to further alleviate concerns, trial judges may place conditions on a defendant's release, such as strict adherence to a curfew, home confinement, electronic monitoring, and drug testing.[29] In 2009, the Harris County Jail Reduction Committee found that "[a]pproximately 15,000 defendants were considered low risk according to interviews by the County's Pretrial Services," and recommended that these individuals should be "eligible for a personal recognizance (PR) bond."[30]

http://www.justicepolicy.org/images/upload/08–04_REP_JailingCommunities_AC.pdf.

26. According to the Texas Office of Court Administration (OCA), in 2012, 3,733 individuals convicted of aggravated assault or attempted murder were placed on community supervision while 3,930 were sent to prison; more were released into the community than went to prison. For those convicted of sexual assault of an adult, 192 were placed on community supervision, while 616 were sent to prison-for every three convicted rapists sent to prison one was released into the community. For those convicted of indecency with a child or sexual assault of a child, 532 were placed on community supervision while 2,115 were sent to prison-for every four convicted child molesters sent to prison, one remained in the community. In almost every single Texas county jail, the largest number of jail inmates are those charged with felonies who are awaiting trial. TCJS "Abbreviated Population Report for 5/1/2013." Indeed, in December 2010, approximately half of the detainees in the Harris County jail were being held in pretrial detention. Martha Johnson and Luckett Anthony Johnson, *Bail: Reforming Policies to Address Overcrowded Jails, the Impact of Race on Detention, and Community Revival in Harris County, Texas*, 7 Nw. J.L. & Soc. Pol'y 42, 46 (2012). About 80% of the persons jailed for felony offenses and 64% jailed for misdemeanor offenses are pretrial detainees. *Id.* at 48. Comparing the OCA and TCJS numbers, it appears that the probability of being released into the community under supervision with no monetary strings *after* conviction is significantly greater than the probability of being released into the community under supervision on a personal recognizance bond *before* conviction.

27. *See* Meyers, *supra* note 23 at 389, 392 (noting that releasing a defendant on his own recognizance and requiring that defendant to post bail result in a similar appearance rate).

28. *See generally* Mitchel N. Herian & Brian H. Bornstein, *Reducing Failure to Appear in Nebraska: A Field Study* (2010) (finding a significant decrease in failure-to-appear rates when defendants are mailed a reminder of their court date); CRIMINAL JUSTICE COORDINATING COUNCIL & FLAGSTAFF JUSTICE COURT, *Court Hearing Call Notification Project* (2006) (finding a similar reduction in failure-to-appear rates when defendants are notified of upcoming court dates via telephone).

29. *See* TEX.CODE CRIM. PROC. arts. 17.43–17.49.

30. Harris County Jail Reduction Committee Facts and Recommendations 1 (presented to the Texas Commission on Jail Standards Meeting August 5, 2010), available at: http://static.texastribune.org/media/documents/DOC 008.PDF.

At that time, "at least 500 individuals have been jailed longer than a year awaiting trial, while approximately 1,200 have been in jail six months or more." [31]

In some cases, even when the bond is set at a reasonable, low-dollar amount, the defendant still cannot post it. While some defendants have friends and family who can help them post bail, others do not. These unfortunate many, then, are left with two choices: remain in custody until trial (which likely means losing their job, and being separated from their family),[32] or, if they qualify,[33] seek the services of a for-profit bail bondsman, which comes with its own set of costs and risks.

Setting an appropriate bail or permitting pretrial release on a personal recognizance bond is a weighty decision with important considerations and constitutional concerns on all sides. It is, however, a decision that all too often results in the pretrial detention of the accused citizen, despite compelling evidence suggesting pretrial release may be less costly to the community, fairer to the defendant, and, when appropriate conditions are attached, capable of ensuring the safety of the community. Appellate courts must provide meaningful review of the bail and pretrial-release decision to ensure that trial judges strike a constitutional balance between community safety and ensuring a defendant's appearance on one side, and the social and financial costs (both to the State

and defendant) of oppressive pre-trial detention on the other.

Because this petition does not clearly raise these difficult issues, I concur in the Court's decision to refuse Mr. Benefield's petition for discretionary review.

---

**31.** *Id.*

**32.** *See Barker,* 407 U.S. at 532, 92 S.Ct. 2182.

**33.** Not all defendants will be able to retain the services of a commercial bail bondsman. Due to the nature of the bond industry, the profitability of a bond increases as its dollar amount increases. This is due to the fixed costs associated with searching for and bringing in a defendant when they do not appear. In other words, issuing a bond for only a few hundred dollars profit may not be worth the potential cost if the defendant does not show

up. Therefore, many bail bondsman will not issue low-money bonds. Curiously, these defendants with low bonds are the ones the court deemed the lowest threat to fail to appear, yet they are the ones unable to obtain the bond and instead await trial detained. *See* Pretrial Justice Institute & The MacArthur Foundation, *Rational and Transparent Bail Decision Making: Moving From a Cash–Based to a Risk–Based Process* 6–9 (Mar. 2012), *http://www.pretrial.org* (Under "Featured Resources").