# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00018-CR

---

## Ex parte Bo Dresner

---

**FROM THE 22ND DISTRICT COURT OF HAYS COUNTY**
**NO. CR-19-0800-B-HC, THE HONORABLE JACK H. ROBISON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Bo Dresner was indicted in May 2020 on 65 counts, including two counts of aggravated sexual assault of a child, two counts of continuous sexual abuse of a child, two counts of indecency with a child by sexual contact, and 59 counts of possession with intent to promote child pornography.[1]  On December 21, 2021, appellant filed a pretrial application for writ of habeas corpus requesting that he be released because of the State's unreadiness for trial or, alternatively, that the total amount of his bonds be reduced.  *See* Tex. Code Crim. Proc. art. 11.08.  The trial court denied the application, and appellant appeals the ruling.  In two issues, he contends that the trial court abused its discretion by denying relief under article 17.151 of the Texas Code of Criminal Procedure and by failing to reduce the total amount of his bonds to an amount that he could afford.  *See id.* art. 17.151.  We will affirm the trial court's order denying habeas relief.

---

[1]  Appellant was initially indicted on 20 counts on June 19, 2019.  Following further outcries against him, superseding indictments were filed on October 9, 2019, and May 6, 2020.

## BACKGROUND

Law enforcement began investigating appellant in March 2019 after his 14-year-old daughter, K.D.,[2] contacted a family member and reported that appellant was "doing it again and [was] using drugs and manipulation to do it." The family member understood "doing it again" to refer to sexual abuse and was aware of "previous reports" of appellant abusing K.D. "dating back to 2012." K.D. and her sister L.D. made additional outcries to CPS and a detective with the Hays County Sheriff's Office (HCSO).

Officers obtained an arrest warrant for appellant on April 2nd and surveilled his home overnight. They arrested him the next morning after observing him attempting to leave in a vehicle driven by a friend, who told them that he was taking appellant to the airport. Appellant's bags contained the citation from his CPS case, three half-used bottles of sexual lubricant, clothing, a laptop, a box of condoms, a black mask, mesh underwear, and a "red rose [that] opens up into a pair of thong underwear." In a band on his ankle were his birth certificate, immunization history, and passport—which was expedited and had been issued the day before. He also had approximately $5,000 in cash and a flight itinerary, dated April 2, 2019, with a final destination of Armenia, a non-extradition country. A search of his electronic devices uncovered 7,500 images of child pornography, including images of his nude children. Thousands more images were discovered on devices in his home. He later admitted in a police interview that he was looking at child pornography and uploading pornography featuring his own children to the Internet for others to view.

---

[2] Because appellant's daughters were minors at the time of the alleged offenses, we will refer to them by their initials in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

He was initially charged on June 19, 2019, in a 20-count indictment for which his cash and surety bonds totaled $650,000. The trial court denied his first habeas application requesting a bond reduction on September 26, 2019, after a hearing at which it found that he was a flight risk. During the hearing, he testified that he had previously been convicted in Minnesota of a misdemeanor for impregnating a child under 16. The victim of that offense, committed when appellant was 26, is K.D.'s mother.

Following further outcries, two superseding indictments increased the number of counts to 65, and, at a second hearing on June 15, 2020, the trial court considered appellant's motion to reduce the total amount of his bonds, which had been increased to $2.4 million by the new charges. Appellant testified that were he to be released, he would live with the mother of Dane Minter, another inmate in the Hays County jail for child sexual offenses. Minter had attempted to draw child pornography while in the jail and was found to have photographs of appellant's children, which appellant had given to him. HCSO Detective Jennifer Baker testified that appellant's mother likely knew K.D. and L.D.'s whereabouts and that appellant "knows the general vicinity of where [K.D.] would be living." At the hearing's conclusion, the trial judge stated that the new outcries "mean[t] that there's maybe a greater danger to the public" and that appellant was "probably more dangerous, more of a flight risk now, than he was at the last hearing." The trial court also found that appellant had violated the conditions of his bond by attempting to send a birthday card to K.D. through his mother. Nevertheless, the court ruled that the "amounts of the cash or surety bonds, including for the new counts, should be changed to total $1 million."

On December 21, 2021, a hearing was held on appellant's second habeas application, at which he testified about his finances. He receives approximately $5,000 a month

3

in disability and social security income and has regular monthly expenses of over $2,100, including for commissary and jail calls. He also spent more than $2,000 on classes, retained an attorney to represent him in his divorce proceeding, and gave an inmate at least $1,800 for her legal fees and GPS monitor and $10,000 to purchase a travel trailer for appellant. The $200,000 proceeds from the sale of his home as part of the divorce have been placed into a trust account, and he considers half to be his. He has no other assets, and no one is able to help him post bond. He has not saved any money to put toward his bond amounts but has instead "been spending it on other things." Moreover, although he has no objection to wearing an ankle monitor as a condition of release, he disagrees with the trial court's requiring him to pay for it because "the payment of it is contrary to federal law." He requested that the court set the total amount of his bonds at $500,000 or "at least the original $650[,000]."

He further testified that he remembered the State asserting during an earlier hearing on April 15, 2021, that it was not ready to proceed to trial, and "for that reason [he was] asking the Court for a reduction in bond that [he] can make, based on Article 17.151." On cross-examination, he testified that the State's assertion was in response to defense counsel stating that she was not ready for trial. The trial court denied the application, and this appeal followed.

## DISCUSSION

### I.       Entitlement to Release Under Article 17.151

In his first issue, appellant contends that the trial court erred by denying his request for release under article 17.151. *See* Tex. Code Crim. Proc. art. 17.151. Specifically, he argues that the State failed to make a prima facie showing that it was ready for trial by the

4

ninetieth day of his confinement. In support of his argument, he asserts that during the hearing on his second habeas application, the State presented "[n]o evidence whatsoever" that it had been ready for trial within the 90 days following his arrest and that it never responded to defense counsel's accusation that it had violated article 17.151.

"We review a trial court's decision to deny relief on a claim that the State violated article 17.151 for an abuse of discretion." *Ex parte Craft*, 301 S.W.3d 447, 448 (Tex. App.—Fort Worth 2009, no pet.) (per curiam) (citing *Jones v. State*, 803 S.W.2d 712, 719 (Tex. Crim. App. 1991)). A trial court abuses its discretion when its action is "arbitrary," "unreasonable," or outside the "zone of reasonable disagreement." *State v. Mechler*, 153 S.W.3d 435, 439–40 (Tex. Crim. App. 2005) (citing *Montgomery v. State*, 810 S.W.2d 372, 378–79 (Tex. Crim. App. 1990)). In reviewing the trial court's decision, we "view the evidence in the light most favorable to the ruling." *Ex parte Craft*, 301 S.W.3d at 448–49. "A habeas applicant has the burden to plead facts which, if true, entitle him to relief and ultimately to establish those facts by a preponderance of the evidence." *Ex parte Sandoval*, 508 S.W.3d 284, 286 (Tex. Crim. App. 2016).

Article 17.151 provides in relevant part:

> A defendant who is detained in jail pending trial of an accusation against him must be released either on personal bond or by reducing the amount of bail required, if the state is not ready for trial of the criminal action for which he is being detained within . . . 90 days from the commencement of his detention if he is accused of a felony.

Tex. Code Crim. Proc. art. 17.151, § 1(1).

The article is "mandatory," and, where the State is not ready for trial within 90 days of the beginning of a defendant's detention, a trial court has only two options: either

release the accused on personal bond or reduce the required bail amount "to an amount that the record reflects the accused can make." *Ex parte Lanclos*, 624 S.W.3d 923, 927 (Tex. Crim. App. 2021); *see Hernandez v. State*, 465 S.W.3d 324, 326 (Tex. App.—Austin 2015, pet. ref'd) (explaining that trial court cannot consider factors outside of those in article 17.151). However, even though "readiness" refers to "the State's preparedness for trial," "it does not require that the 'trial could have actually begun at that time,' and 'there is no bright line rule on how much or what type of evidence the State must have available to be prepared for trial.'" *Ex parte Highsmith*, 652 S.W.3d 850, 858 (Tex. App.—Austin 2022, pet. ref'd) (quoting *Ex parte Anderson*, Nos. 01-20-00572, 01-20-00573, 01-20-00574, 2021 WL 499080, at *19 (Tex. App.—Houston [1st Dist.] Feb. 11, 2021, no pet.) (mem. op., not designated for publication)).

Under article 17.151, the State has the initial burden to make a prima facie showing that it was ready for trial within the 90-day period. *Id.* (citing *Ex parte Smith*, 486 S.W.3d 62, 65 (Tex. App.—Texarkana 2016, no 6pet.); *Ex parte Ragston*, 422 S.W.3d 904, 906 (Tex. App.—Houston [14th Dist.] 2014, no pet.)). To meet its burden, the State may either announce within the allotted time that it is ready for trial or "announce retrospectively that it had been ready within that period." *Id.*; *see Ex parte Newson*, 656 S.W.3d 655, 658 (Tex. App.—Texarkana 2022, no pet.); *Ex parte Smith*, 486 S.W.3d at 65. The State's filing of an indictment within the 90-day window is considered prima facie evidence of its readiness for trial. *See Kernahan v. State*, 657 S.W.2d 433, 434 (Tex. Crim. App. 1983) (observing that "the existence of a charging instrument is an element of State's preparedness"); *Ex parte Highsmith*, 652 S.W.3d at 859; *McClellan v. State*, 701 S.W.2d 671, 675 (Tex. App.—Austin 1985), *aff'd*, 742 S.W.2d 655 (Tex. Crim. App. 1987); *see also Ex parte Pace*, No. 03-20-00430-CR, 2021 WL 728168, at *9 n.8 (Tex. App.—Austin Feb. 25, 2021, no pet.) (mem. op., not

designated for publication) ("Because the State made its prima facie showing of its readiness by indicting Pace within 90 days from the date that his jail detention commenced on October 29, 2019, the burden shifted to Pace to rebut it.").

If the State makes the required showing, then the burden shifts to the defendant to rebut the showing. *Ex parte Highsmith*, 652 S.W.3d at 859 (citing *Ex parte Brosky*, 863 S.W.2d 775, 778 (Tex. App.—Fort Worth 1993, no pet.)). "Evidence that rebuts a prima facie showing of readiness 'may consist of, among other things, a demonstration that the state did not have a key witness or piece of evidence available by the last day of the applicable time limit so that the state was not ready for trial within that time limit.'" *Jones*, 803 S.W.2d at 718 (quoting *Barfield v. State*, 586 S.W.2d 538, 542 (Tex. Crim. App. 1979)). If the defendant fails to rebut the State's showing, the trial court may conclude that the State was ready for trial within the 90-day period. *Ex parte Highsmith*, 652 S.W.3d at 859.

Appellant does not dispute that he was first indicted during the 90-day period following his arrest.[3] The State made a prima facie showing of its readiness by indicting appellant within 90 days, and the burden shifted to him to rebut it. *Id.*; *Kernahan*, 657 S.W.2d at 434; *McClellan*, 701 S.W.2d at 675; *Ex parte Pace*, 2021 WL 728168, at *9 n.8.

Furthermore, when asked during the December 2021 hearing on appellant's second habeas application if the State was ready for trial, the State's attorney responded, "Yes, Judge. We can set it for trial as soon as you want." Although appellant is correct that "[i]t is not enough that the State appear in open court after the running of the applicable period and declare itself at that time ready for trial," the record suggests that the State had previously and repeatedly

---

[3] Appellant was arrested on April 3, 2019 and indicted on June 19, 2019—78 days after his arrest.

7

announced its readiness. *Jones v. State*, 803 S.W.2d 712, 717 (Tex. Crim. App. 1991). The following exchange occurred at a subsequent hearing on May 26, 2022:

> THE COURT: I understand [the State is] ready, and I'm fine that you're ready. You have always announced ready, as I recall.
>
> And it's always been [the defense] that asked for a delay.
>
> DEFENSE COUNSEL: I agree completely.
>
> THE COURT: And your client apparently agrees with that because he's not saying anything.
>
> DEFENSE COUNSEL: Correct.
>
> THE COURT: So we'll leave it on pretrial.
>
> DEFENSE COUNSEL: Thanks, Judge.

To rebut the State's prima facie showing of readiness, appellant testified during the December 2021 hearing that he remembered a prosecutor stating at an earlier hearing—on April 15, 2021—that she was not ready to proceed to trial. In her argument, defense counsel similarly asserted, "Regarding the delay in the State being ready for prosecution, I just ask that the Court take into consideration the fact that the State did make the statement they weren't ready to proceed on April 15, which potentially could trigger Article 17.151 of the Code of Criminal Procedure."

Appellant's testimony mischaracterizes the nature of the prosecutor's statement, which was made during a discussion about defense counsel's request for the appointment of co-counsel and repeated entreaties that the case not be set for trial:

> THE STATE: It is a very big case. It will probably be a several week trial. It is bouts of evidence. She is really going to need help.
>
> THE COURT: Okay.

8

DEFENSE COUNSEL: We need a team.

THE COURT: With the caveat that I may not be the trial judge, depending on what my health is once we start back to juries, because he is going to be one of the first ones probably.

DEFENSE COUNSEL: We are not ready for trial by any means, no, Judge.

THE STATE: We're still reviewing the evidence as well, Judge.

. . . .

THE COURT: Might as well put it on the jury status. That way you can get longer.

DEFENSE COUNSEL: I am afraid that you will make us go to trial and we're not close.

THE COURT: I'm not going to make anybody go to trial during Covid. I will promise you that.

DEFENSE COUNSEL: Oh, I know. No, but we really – we have so many pretrial matters yet, sir, I think we're okay.

THE COURT: [The State] is agreeing with you, so I don't think you have a problem there.

DEFENSE COUNSEL: Yeah. Okay. Just keep us on pretrial, if you wouldn't mind, sir. And then if we can just be excused.

The State's remark that it was still reviewing evidence—made after the statutory period had run and subsequent indictments had been filed—is insufficient to rebut its prima facie showing that it had been ready for trial during the 90-day period. *See Jones*, 803 S.W.2d at 718; *Ex parte Highsmith*, 652 S.W.3d at 858. Likewise, the trial judge's professed understanding that the State was agreeing with defense counsel is ambiguous at best, and—from his subsequent ruling on the second habeas application and statements during the May 2022 hearing—appears to have been in reference only to defense counsel's readiness.

For these reasons, we conclude that the trial court did not abuse its discretion by denying appellant's request for relief under article 17.151. *See Ex parte Craft*, 301 S.W.3d at 448. We overrule his first issue.

## II.     Excessive Bond[4]

In his second issue, appellant contends that the trial court abused its discretion by failing to reduce his total bond amount to one that he could afford. He asserts that his $1 million bond total is excessive under the factors listed in article 17.15 of the Code of Criminal Procedure and *Ex parte Rubac*, 611 S.W.2d 848, 849–50 (Tex. Crim. App. 1981). *See* Tex. Code Crim. Proc. art. 17.15.

"'Bail' is the security given by the accused that he will appear and answer before the proper court the accusation brought against him, and includes a bail bond or a personal bond." *Id.* art. 17.01. With certain exceptions not applicable here, the Texas Constitution guarantees that "[a]ll prisoners shall be bailable by sufficient sureties." Tex. Const. art. I, § 11; *see* Tex. Code Crim. Proc. art. 1.07. Both the federal and state constitutions prohibit "excessive" bail. U.S. Const. amend. VIII; Tex. Const. art. I, § 13; *see* Tex. Code Crim. Proc. art. 1.09. Bail is considered excessive if it is "set in an amount greater than is reasonably necessary to satisfy the government's legitimate interests." *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd).

The Code of Criminal Procedure commits the setting of bail to the discretion of the trial court or magistrate but sets forth rules that, together with the Constitution, govern the exercise of that discretion:

---

[4] Chapter 17 of the Code of Criminal Procedure uses the terms "bail" and "bond" interchangeably. *Ex parte Gomez*, 624 S.W.3d 573, 576 (Tex. Crim. App. 2021).

(1) Bail and any conditions of bail shall be sufficient to give reasonable assurance that the undertaking will be complied with;

(2) The power to require bail is not to be used to make bail an instrument of oppression;

(3) The nature of the offense and the circumstances under which it was committed are to be considered, including whether the offense involved violence;

(4) The ability to make bail shall be considered, and proof may be taken on this point;

(5) The future safety of a victim of the alleged offense, law enforcement, and the community shall be considered;

(6) The criminal history record information for the defendant shall be considered, including any acts of family violence, other pending criminal charges, and any instances in which the defendant failed to appear in court following release on bail; and

(7) The citizenship status of the defendant shall be considered.

Tex. Code Crim. Proc. art. 17.15; *see Chavez v. State*, 671 S.W.3d 775, 785 (Tex. App.—Fort Worth 2023, no pet.).

The "nature and circumstances" of the case "implicate the range of punishment." *Ex parte Gomez*, 624 S.W.3d 573, 576 (Tex. Crim. App. 2021). "Other relevant factors include the defendant's employment history, family ties, length of residency, criminal history, previous bond compliance, and other outstanding bonds, and the aggravating facts of the charged offense." *Id.* at 576 (citing *Ex parte Rubac*, 611 S.W.2d at 849–50). The burden is on the defendant to prove that bail is excessive in light of the above factors. *Ex parte Rubac*, 611 S.W.2d at 849; *Ex parte Benefield*, 403 S.W.3d 240, 242 (Tex. Crim. App. 2013) ("On appeal or in a habeas proceeding, the defendant has the burden to prove that bail is excessive.").

We review the trial court's ruling on a request for a bail reduction for an abuse of discretion. *Ex parte Rubac*, 611 S.W.2d at 850; *Ex parte Beard*, 92 S.W.3d at 568; *see Ex parte*

11

*Gill*, 413 S.W.3d 425, 428 (Tex. Crim. App. 2013) (stating that "the decision of a trial judge at a habeas proceeding regarding the imposition or reduction of bail 'will not be disturbed by this Court in the absence of an abuse of discretion'" (quoting *Ex parte Spaulding*, 612 S.W.2d 509, 511 (Tex. Crim. App. 1981))). Thus, we will not disturb the trial court's ruling if it was within the zone of reasonable disagreement. *Clemons v. State*, 220 S.W.3d 176, 178 (Tex. App.—Eastland 2007, no pet.); *Ex parte Beard*, 92 S.W.3d at 573; *see Ex parte Brooks*, 376 S.W.3d 222, 225 (Tex. App.—Fort Worth 2012, pet. ref'd) ("To determine whether the trial court abused its discretion [in ruling on a request to reduce bail], we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable."). In addition, we view the record and evidence in the light most favorable to the trial court's ruling. *See Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006). The trial court is the exclusive judge of witness credibility, and we afford it "considerable discretion in making those challenging determinations." *Ex parte Everage*, No. 03-17-00879-CR, 2018 WL 1788795, at *9 (Tex. App.—Austin Apr. 13, 2018, no pet.) (mem. op., not designated for publication) (observing that bail cases involve "the difficult task of weighing the specific facts of a case against many, often contravening factors, and often in the face of scant evidence"); *see Esquivel v. State*, 922 S.W.2d 601, 604 (Tex. App.—San Antonio 1996, no pet.) (stating "[t]he trial court, as the trier of fact, has the job of judging the credibility of the witnesses and the weight to be given their testimony" at bond hearing); *Ex parte Duque*, 540 S.W.3d 136, 145 (Tex. App.—Houston [1st Dist.] 2017, pet. struck) ("In habeas proceedings, '[v]irtually every fact finding involves a credibility determination,' and 'the fact finder is the exclusive judge of the credibility of the witnesses.'" (quoting *Ex parte Mowbray*, 943 S.W.2d 461, 465 (Tex. Crim. App. 1996))).

### A.        *Sufficient bail to assure appearance but not oppress*

The primary purpose of bail is to secure the presence of the accused at trial on the offenses charged. *Ex parte Rodriguez*, 595 S.W.2d 549, 550 (Tex. Crim. App. 1980). Bail must be set in an amount high enough to give reasonable assurance that the accused will appear as required. *Ex parte Pace*, 2021 WL 728168, at \*5 (citing *Ex parte Charlesworth*, 600 S.W.2d 316, 317 (Tex. Crim. App. 1980)). However, it should not be used "as an instrument of oppression" nor "for the express purpose of forcing [an accused] to remain incarcerated pending appeal." *See Ex parte Harris*, 733 S.W.2d 712, 714 (Tex. App.—Austin 1987, no pet.).

Nothing in the record indicates that the trial court refused to reduce appellant's bond amounts to ensure his continued incarceration, and we have no basis for inferring such a purpose. *See Montalvo v. State*, 315 S.W.3d 588, 596 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("Our independent review of the habeas corpus record likewise does not suggest that the trial court deliberately set bail at an excessively high level solely to prevent [defendant] from posting bail."); *cf. Ex parte Harris*, 733 S.W.2d at 714 (concluding that district court abused its discretion where trial judge refused to reduce bond and stated, "I'd rather see him in jail than to see someone's life taken").

Rather, the record—viewed in the light most favorable to the trial court's ruling— suggests that appellant's bonds were set at a high amount in part because he posed an exceptional flight risk, and in the absence of substantial bail there was little assurance that he would appear as required. He was arrested in the process of fleeing to Armenia, a non-extradition country, and, in his luggage, officers discovered sexual lubricant, a box of condoms, a laptop containing thousands of images of child pornography, a black mask, mesh and thong-style underwear, and approximately $5,000 in cash. Strapped to his ankle were his birth certificate, immunization

13

history, and passport, which had been issued only the day before. He testified that he had known that he was the subject of an investigation when he obtained the expedited passport and that the trial judge should trust that he would not attempt to obtain another. Although he also testified that he would be willing to wear a GPS monitor, he opposed the requirement that he pay for it, explaining that "the payment . . . is contrary to federal law." Detective Jennifer Baker testified that appellant was a flight risk and that she believes that, if released, he will try to leave the country. She testified that even if he did not have any financial resources, he could "easily go to Mexico and have it not cost him very much money." His only response was to claim that if he were to go to Mexico, a cartel "bounty hunter" formerly associated with the Texas State Guard would assassinate him.

In denying appellant's repeated requests for bond reduction, the trial judge variously stated:

(1) [H]is flight risk is the main reason I'm not even going to consider lowering the bond from what it is.

(2) [T]he Court considered as a pretty good argument, that maybe 650- wasn't enough, given his shown ability to escape the country, get an expedited passport. He knows how to do those things, might have been from his training in Special Ops. I don't know. But he clearly knew what to do, even had his immunization records, had his birth certificate, had everything he needed and did it within a very short time, when he thought he was just in trouble with CPS. Now he's looking at long-term imprisonment.

(3) Having succeeded at that and his knowledge of how to get out of the country, I have no reason to believe he's not any more of a flight risk. In fact, I think he's probably more dangerous, more of a flight risk now, than he was at the last hearing.

14

We conclude that appellant has failed to show that his bond amounts were set with the express purpose of keeping him jailed and not to ensure his presence at trial. This factor strongly supports the trial court's ruling.

**B.** *Nature of the offenses*

The "primary factors" to consider when evaluating the reasonableness of bail are the nature of the offense and the punishments that can be imposed for committing it. *See Ex parte Rubac*, 611 S.W.2d at 849; *Ex parte Dupuy*, 498 S.W.3d 220, 230 (Tex. App.— Houston [14th Dist.] 2016, no pet.). "If the offense is serious and involves a lengthy potential prison sentence, a defendant may have a strong incentive to flee the jurisdiction; thus, bail must be set in an amount sufficiently high to secure the defendant's presence at trial." *Ex parte Brown*, No. 04-22-00649-CR, 2023 WL 5945884, at *3 (Tex. App.—San Antonio Sept. 13, 2023, no pet. h.) (mem. op., not designated for publication) (citing *Ex parte Castillo-Lorente*, 420 S.W.3d 884, 888 (Tex. App.—Houston [14th Dist.] 2014, no pet.)).

Appellant acknowledges that he has been charged with "very serious offenses" and that the consequences of a conviction are "great." He is charged with 65 counts alleging various child sexual offenses, including multiple counts of aggravated sexual assault of a child and continuous sexual abuse of a child. *See* Tex. Penal Code §§ 21.02, .11(d), 22.021(f)(2), 43.26(g). As the State noted in the hearing on appellant's second habeas application, "[E]very single one of these charges can run consecutive[ly]. He is facing multiple life sentences, with no possibility of parole, especially on two of them." *See id.* § 3.03(b)(2), (3); Tex. Gov't Code § 508.145(a).

15

The circumstances of the charged offenses are particularly severe. Appellant is alleged to have sexually assaulted and abused his young daughters, K.D. and L.D.; uploaded pornography in which they were depicted to the dark web; and possessed thousands of additional images of child pornography. The abuse against K.D. and L.D. is alleged to have occurred for a period of years and begun when K.D. was six years old. Although the record is unclear as to when the abuse against L.D. began, she was only seven years old at the time of the first bond hearing in this case in 2019. Appellant is also alleged to have given K.D. melatonin or hydrocodone and vaginally penetrated her with his penis. Thus, the alleged facts and ranges of punishment support the trial court's ruling.

## C.  *Ability to make bail*

While the defendant's ability to make bail must be considered, it is not controlling. *See* Tex. Code Crim. Proc. art. 17.15(4); *Ex parte Gentry*, 615 S.W.2d 228, 231 (Tex. Crim. App. 1981). Likewise, an inability to make bail does not automatically render the amount excessive. *Ex parte Scott*, 122 S.W.3d 866, 870 (Tex. App.—Fort Worth 2003, no pet.); *Ex parte Hopkins*, Nos. 03-19-00695-CR, 03-19-00715-CR, 2020 WL 4929775, at *3 (Tex. App.—Austin Aug. 20, 2020, no pet.) (mem. op., not designated for publication). This applies even when the accused is determined to be indigent. *Ex parte Charlesworth*, 600 S.W.2d 316, 317 (Tex. Crim. App. 1980). Rather, the ability to make bail is "only one factor to be considered." *Ex parte Hopkins*, 2020 WL 4929775, at *3; *see* Tex. Code Crim. Proc. art. 17.15.

Appellant testified about his finances at the December 2021 hearing. He receives approximately $5,000 a month in veteran's disability and social security payments, but the

16

amounts may have increased.[5] His regular monthly expenses amount to around $2,600: $1,000 for his wife's car and vehicle-insurance payments, $600 for his commissary account, and $1,000 for telephone calls. Although the $200,000 proceeds from the sale of his and his wife's home have been placed in a trust account pending the resolution of their divorce proceedings and although defendant feels that half of the sum is his, he acknowledged that his wife was claiming the entire amount and that the court overseeing the divorce had yet to make a ruling.

He also had several large one-time expenditures while in jail, including a $5,000 retainer for his divorce attorney, over $2,000 on paralegal classes, $10,000 for a travel trailer in which he intends to reside on his release, and at least $1,800 for a fellow inmate's legal fees and GPS monitor. He testified that he had not saved any money to put toward his bond amounts, that he had less than $5,000 in his checking account, that he had no other assets to post as collateral, that no one is able to help him financially, and that he spent $5,000 returned after seizure by the State on the commissary and law books. He further testified that he had attempted to employ bail bond companies but that they had demanded collateral and that his "only recourse at this point is to try to put cash down towards a bond." At the hearing's conclusion, he asked that the trial court reduce his total bond amount to "$500,000 or the original 650-"[6] so that "he can try to chip away and try to work towards having an opportunity to make a bond one day in the future."[7]

---

[5] In an earlier hearing, the State informed the trial court that, for a time, appellant was receiving almost $8,000 a month, including back pay.

[6] Appellant's total bond amount was set at $650,000 after the initial 20-count indictment.

[7] Appellant does not explain, given his description of the parlous state of his finances, how he can afford a $500,000 bond. The discrepancy between his accounting of his assets and

Appellant did not explain to the trial court why he had failed to apply any of his substantial income toward his bond. He testified merely that he had not been able to save any money for bail because he had "been spending it on other things, . . . other obligations or other decisions that [he had] made." He likewise did not inform the court of the amount of collateral requested by the bail bond companies. Indeed, the trial judge may have doubted appellant's credibility with respect to his efforts to obtain the assistance of such a company. In explaining why he had been unsuccessful, appellant appeared to imply that physical assets were required, testifying, "[T]hey want collateral and, basically, all of my possessions that I had during the time my ex-wife and I were together. So they were sold off, given away. I don't know how they were disposed of. So I don't have anything." Conversely, during an earlier hearing, he had testified that "[he] tried to contact the bond companies, but they won't answer the call from inside the jail."

Regarding his attempts to obtain loans or financial assistance from family or friends, he testified only that he had asked others to post collateral or to loan him money, and "nobody is able to."[8] *Milner v. State*, 263 S.W.3d 146, 149 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("To show that he is unable to make bail, a defendant must show that his funds and his family's funds have been exhausted."). There is no evidence in the record as to family income or properties or whether appellant has retirement savings or even a vehicle. Given the absence of specific and detailed evidence concerning appellant's and his family's financial

---

his request for such an amount may also go some way toward the trial court's reasonably questioning the credibility of his testimony.

[8] During an earlier hearing, appellant was also vague: "[M]y mother is indigent, and my father is not doing that well financially. So, outside of that, I don't have anyone that I can readily draw on for finances."

18

circumstances, the trial court could have concluded that appellant's testimony was inadequate and that the bail amounts set were reasonable. *See Ex parte Castellanos*, 420 S.W.3d 878, 883 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Alternatively, because he did not show why he could not apply his income toward a bond or that his funds and those of his family had been exhausted, the trial court could have reasonably determined that he had failed to meet his burden of showing that the total bond amount was excessive because of his inability to make bail. *See Ex parte Pace*, 2021 WL 728168, at *5. For these reasons, this factor at most slightly disfavors the trial court's ruling.

#### D. *Future safety, criminal history, and citizenship*

There is ample evidence in the record, in particular from appellant's criminal history and the nature of the charged offenses, indicating that he is a risk to the safety of the alleged victims in this case and to the community more broadly. *See Milner*, 263 S.W.3d at 151 ("Moreover, appellant's record and the gravity and nature of the charges against him indicate that he presents a risk to the safety of the community."). In 2006, appellant was convicted in Minnesota of fifth-degree criminal sexual conduct for impregnating a minor. According to the complaint, he was 26 at the time, and the victim—K.D.'s mother—was 15. Appellant was required to register as a sex offender for 10 years, but the registration period was extended because his treatment "was ongoing." He testified that "after a period of two years, they said [he] did not need to register because [he] was out of state. [He] sent in [his] stuff, and Texas told [him] that he did not need to register." Elsewhere, however, he testified that he is currently registered as a sex offender in Texas and plans to appeal the requirement. From his conflicting

19

testimony, the trial court could have reasonably concluded that appellant might not comply with any registration obligations upon his release.

The court found that he had already violated the bond conditions imposed in this case by attempting to contact K.D. Appellant testified that although he had sent K.D. a birthday card through his mother, a State employee had told him that he could do so. Elsewhere, he testified that he had believed that his bond conditions would only take effect upon his release and that his mother had told him that a CPS social worker had informed her that it was okay to send the card. Detective Baker testified that appellant "knows the general vicinity of where [K.D.] would be living" and that Baker would assume that because appellant's mother stated that she had sent the cards, she knows K.D. and L.D.'s location. K.D. told prosecutors that "she's afraid of [appellant] physically because of his strength," that she "does not want [appellant] to be her parent anymore," and that appellant "would tell lies all the time."

Appellant's intended living arrangements were he to be released increase the risk of danger to the community. He initially informed the trial court that he would live in a rental unit owned by the mother of Dane Minter, another inmate in jail for child sexual offenses. Detective Baker testified that she would be concerned if appellant went to live with Minter's mother because Minter and appellant are in jail for the same type of offenses; Minter's mother supports him; and Minter was trying to draw child pornography in the jail and was in possession of photographs of appellant's children, which appellant had given him. Appellant later told the court that he intended to live in a travel trailer on a friend's property in rural Bastrop County. He testified that he would need to leave the property for medical appointments and to attend court and that he opposed having to pay for a GPS ankle monitor.

20

Lastly, there is evidence in the record that appellant has a violent temper. While in jail, he was written up for starting a fight with another inmate over a television remote. Appellant's teenage son, C.D., told prosecutors that appellant has "anger management issues"; that he once threw a ladder at a truck during an argument; that he would slap C.D., pull his hair, spank him, yell at him, and call him names "24/7"; that appellant was fired from jobs because of his anger issues; that he lifted C.D. up and pushed him against a wall; and that he was scared of appellant during the incident.

There is nothing in the record concerning appellant's citizenship status. Nevertheless, from the nature and circumstances of the charged offenses, his criminal history, his violating the conditions of his bond, his intended living arrangements, his refusal to pay for a GPS monitor, and his history of violence, the trial court could have reasonably determined that he posed a significant threat to both the alleged victims and the community. As the trial judge noted following the filing of the superseding indictments, "There's also new outcries, which means that there's maybe a greater danger to the public, new charges, with new indictments . . . . I think he's probably more dangerous, more of a flight risk now, than he was at the last hearing." These factors weigh heavily in favor of the trial court's ruling.

### E. *Other factors*

The record is mostly silent about appellant's employment history, length of residency, and family ties. He is a veteran who previously worked in security and appears to receive income from disability and social security payments. His house has been sold, and he intends to live in a travel trailer if released. He has no communication with his spouse, and his parental rights have been terminated. He testified that he has no family members who can help

21

him, that his mother is indigent, and that his father is "not doing that well financially." Appellant's relationship with his parents is unclear from the record. With respect to bond compliance, he has already been found to have violated the conditions of his current bonds. He does not appear to have other outstanding bonds. As to aggravating facts of the charged offenses, he is alleged to have sexually assaulted and abused especially young children. Moreover, he not only admitted to possessing child pornography featuring his minor daughters but also to uploading it to the Internet for others' viewing.

From this record, the trial court could have reasonably concluded, within the zone of reasonable disagreement, that appellant has few if any ties to remain in the country for trial. These factors weigh in favor of the trial court's ruling.

### F. *Summary*

The charged offenses' natures, circumstances, and ranges of punishment are serious. Reviewed in the light most favorable to the trial court's ruling, the record reflects that appellant is an acute flight risk, poses a significant risk to the safety of the alleged victims and the community, previously violated the conditions of his bond, would refuse to comply with a requirement that he pay for a GPS ankle monitor, has been previously convicted of a child sexual offense, and has few ties to the area or incentives to appear at trial. Although appellant does not appear to have the ability to meet the set bail amount, he has devoted his substantial income to discretionary spending rather than saving toward his bonds, and the record suggests that the trial court had reason to question the credibility of his testimony. Moreover, the ability to meet bail is but "one factor to be considered." *Ex parte Hopkins*, 2020 WL 4929775, at *3. For all of these reasons, we cannot conclude that the trial court abused its discretion by denying appellant's

22

request for a bail reduction.  *See Ex parte Rubac*, 611 S.W.2d at 850; *Ex parte Beard*, 92 S.W.3d at 568; *Ex parte Gill*, 413 S.W.3d at 428.  We overrule his second issue.

## CONCLUSION

Having overruled both of appellant's issues, we affirm the order of the trial court denying habeas relief.[9]

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed

Filed:   December 1, 2023

Do Not Publish

---

[9] In addition, all pending motions are dismissed as moot.